893 F.2d 732
 58 Ed. Law Rep. 48
 Jake AYERS, Sr., et al., Plaintiffs, Jake Ayers, Jr., Bennie
G. Thompson, Leola Blackmon, Lillie Blackmon,
Louis Armstrong, Darryl C. Thomas and
Leon Johnson, Plaintiffs-Appellants,
and
United States of America, Intervenor-Appellant,
v.
William ALLAIN, Governor, State of Mississippi, et al.,
Defendants-Appellees.
 No. 88-4103.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 6, 1990.
 
 Robert Pressman, Center for Law & Educ., Cambridge, Mass., Alvin O. Chambliss, Jr., Oxford, Miss., for Ayers, et al.
 Linda F. Thome, Jessica Dunsay Silver, Nathaniel Douglas, John R. Moore, Levern M. Younger, Franz R. Marshall, and Zita Johnson-Betts, U.S. Dept. of Justice, Civ. Rights Div., Educ., Opportunities Litigation, Sec., Washington, D.C., for the U.S.
 Mike Moore, Atty. Gen., Paul Stephenson, William F. Goodman, Jr., Ed Davis Noble, Jr., Jackson, Miss., for defendants-appellees.
 Appeals from the United States District Court for the Northern District of Mississippi.
 Before GOLDBERG, JOHNSON and DUHE, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 " 'The time has come,' the Walrus said, 'To talk of many things:
 
 
 2
 Of shoes--and ships--and sealing wax--Of Cabbages--and kings--
 
 
 3
 And why the sea is boiling hot--and whether pigs have wings.' "[1]
 
 
 4
 We'll sit and chat of times gone by, and visit with the queens
 
 
 5
 Brown, and, Sweatt and Meredith not to mention the fertile Green
 
 
 6
 And then we'll see why Ayers should fly and how equality is king!
 
 
 7
 Today we write an opinion concerning a class action lawsuit involving the public universities of Mississippi. The question is whether the racial identity of these institutions results from the free choice of the students or from state policies and practices.
 
 
 8
 A group of plaintiffs filed this lawsuit against the Governor of Mississippi, the Board of Trustees of State Institutions of Higher Learning of the State of Mississippi, the Commissioner of Higher Education, and other state officials in January, 1975. These private plaintiffs consists of a class certified by the district court as:
 
 
 9
 all black citizens residing in Mississippi, whether students, former students, parents, employees or taxpayers, who have been, are, or will be discriminated against on account of race in receiving equal educational opportunity and/or equal employment opportunity in the universities operated by said Board of Trustees.[2]
 
 
 10
 They have alleged that the defendants were maintaining and perpetuating a racially dual system of public higher education in violation of the equal protection clause of the fourteenth amendment and Title VI of the Civil Rights Act of 1964.
 
 
 11
 The United States intervened as a plaintiff shortly thereafter making identical allegations. The private plaintiffs and the United States, collectively referred to as "the plaintiffs," seek an injunction directing the defendants to eliminate all vestiges of the racially segregated system of higher education in Mississippi.
 
 
 12
 The defendants answered the plaintiffs' allegations arguing that the existence of predominantly one race universities does not violate the equal protection clause because Mississippi has implemented, in good faith, a nondiscriminatory admissions and operations policy. The defendants believe that the identifiability of the universities by the racial composition of the student population results from the free and unfettered choice of the students themselves.
 
 
 13
 In the spring of 1987, a five week trial was conducted in Oxford, Mississippi following twelve years of pretrial preparation. The record consists of 4,400 pages of trial testimony and approximately 2000 exhibits. At the end of 1987, the district court ruled for the defendants on the issue of liability and dismissed the plaintiffs' case.[3] The plaintiffs appeal.
 
 I. THE FACTS
 A. A History of De Jure Discrimination
 
 14
 The Mississippi university system consists of eight institutions and several entities under the plenary power of a Board of Trustees (the "Board").[4] These universities were segregated by race through the spring of 1962, contrary to the Supreme Court's 1954 mandate in Brown v. Board of Education,[5] when our court forced the University of Mississippi to admit its first black student, James Meredith.[6] Prior to the admission of Meredith, no black students attended any of the historically white universities and no white students attended any of the historically black universities. The historically white universities were: (1) the University of Mississippi; (2) Mississippi State University; (3) the University of Southern Mississippi; (4) Mississippi University for Women; and, (5) Delta State University. The historically black universities were what are now known as: (1) Jackson State University; (2) Alcorn State University; and, (3) Mississippi Valley State University.
 
 
 15
 At the time of the Meredith decision, the Board had implemented segregative policies encompassing: (1) student enrollment; (2) the maintenance of branch centers by the historically white universities in close proximity to the historically black universities; (3) the employment of faculty and staff; (4) facility provision and condition; (5) the allocation of financial resources; (6) academic program offerings; and, (7) the racial composition of the Board and its staff.[7] The Board did not permit black students to enroll at any of the historically white universities under its auspices.[8] The years each of the historically white universities first enrolled a black student are as follows:
 
 
 16
 Similarly, white students did not attend a historically black university until the late 1960's:
 
 
 17
 Alcorn State University ................ 1966
Jackson State University ............... 1969
Mississippi Valley State University .... 1970
 
 
 18
 The racial identification of Mississippi's public universities continues to the present day. Undergraduate programs included the following percentages of black enrollment between the years 1973-74 and 1985-86:
 
 197374 198081 198586
 Historically White Institutions
 
 
 [9]
 
 
 
 
 19
 9. * The figure for Mississippi State University for 197374 is an average
 
 
 20
 derived from 197273 and 197475 data because data for 197374 are not
 
 
 21
 Note availablle.
Delta State University 14.3 17.1 17.59
Mississippi State University 5.6 * 11.2 11.0
Mississippi University for Women 9.9 19.3 18.0
University of Mississippi 3.5 7.0 5.9
University of Southern Mississippi 4.5 11.3 14.24
Historically Black Institutions
Alcorn State University 99.7 96.9 95.6
Jackson State University 99.6 95.2 91.9
Mississippi Valley State University 99.7 99.8 99.3
 
 
 22
 The racial composition of the graduate programs reflects a similar pattern.
 
 197374 198081 198586
 Historically White Institutions
 
 
 [10]
 
 
 
 
 23
 10. ** In 198586, Jackson State University enrolled 59% black, 13.3% white,
 
 
 24
 and 27.7% other-race pupils. For 197374, Mississippi State University and
 
 
 25
 the University of Southern Mississippi are averages of 197273 and 197475
 
 
 26
 Note data because 197374 data are not available.
Delta State University 41.6 38.3 26.2
Mississippi State University 12.8 ** 9.6 8.0
Mississippi University for Women 14.5 18.0 13.0
University of Mississippi 7.6 8.4 7.5
University of Southern 9.2 ** 8.7 8.1
 Mississippi
Historically Black Institutions
Alcorn State University 0 99.4 96.0
Jackson State University 91.8 85.3 59.0**
Mississippi Valley State 0 94.7 96.7
 University
 
 
 
 In summary, regarding undergraduate enrollment in 1986, over 99% of the white students (26,759 out of 26,953) were enrolled in historically white institutions and over 71% of the black students (9,125 out of 12,826) were enrolled in historically black institutions.
 B. Admissions Policies
 The historically white institutions require all applicants to achieve a minimum score of 15 on the ACT, a standardized college admissions examination, as a prerequisite for admission. The Board instituted this policy soon after the court ordered admission of James Meredith to the University of Mississippi in 1962 because it deterred black enrollment.[11] At the time, the average ACT score for white Mississippi students was 18 while the average for black Mississippi students was 7.
 In 1976, the Board augmented the ACT requirement requiring a minimum score of 9 for admission to any of Mississippi's public universities ostensibly in response to complaints voiced by university faculty and staff regarding the preparation of incoming freshmen. This ACT minimum was directed at the historically black schools. The three largest historically white schools maintained the 15 ACT minimum.
 The Board again modified admission requirements in 1977 and in 1982. In 1977, the Board created an exception to the 9 point ACT minimum. Students with ACT scores of 9 or above could be admitted to the historically white schools if they fell into a special talents or high risk category. And as of 1982, the Board required high school graduates to complete a group of college preparatory courses as an admissions prerequisite.
 The college preparatory course requirement applies to all of Mississippi's public universities but the ACT exception is more liberal at the historically black institutions. The historically white institutions may enroll a number of students not to exceed five percent of the previous academic year's freshmen class under the talented or high risk exception.[12] At Jackson State University, however, the limit is eight percent and at Alcorn State University and Mississippi Valley State University the limit is ten percent.
 Apart from the ACT exception, the prerequisites for admission to Mississippi's public universities are thus the completion of a core curriculum in high school and a minimum score on the ACT which varies with the institution. Presently, the minimum score is 15 at the historically white institutions and 13 at the historically black institutions.[13] Completion of these requirements allows automatic admission.
 However, the organization that developed the ACT, the American College Testing Program, advises colleges to use the ACT in conjunction with other considerations so that a whole picture of a student can be assessed rather than one based solely on a standardized test. In the case of minority candidates, the American College Testing Program stresses the inadequacy of the ACT score as the sole criterion for admission:
 Because many factors (e.g., socioeconomic status, differences in educational opportunities, culture, etc.) can potentially affect the test performance of many students who are members of minority groups, ACT believes that assessment for the purpose of college admissions should reflect as complete a picture as possible of students and should include other information in addition to test scores.... In the case of minority students whose prior educational opportunities have been limited, it becomes especially appropriate to make use of the total scope of information--cognitive as well as non-academic--provided by the ACT assessment.[14]
 Moreover, ACT policies state that "investigation[s] of differential validity for subgroups of ... minority/non-minority [applicants]" should be done where possible.[15] This type of admissions investigation refers to the effectiveness of ACT scores in predicting college success for black as opposed to white applicants. Apparently, ACT score data should not be used as the sole criterion for admission/selection decisions especially regarding minority candidates. It is thus no surprise that ACT provides without charge, materials allowing a more accurate selection of individual students utilizing high school grades. The state universities of Mississippi, however, continue to consider only the single ACT score to define the automatic admission pool.
 C. The Relative Composition of the Faculties
 Mississippi's public universities had the following percentages of black faculty in 1985-86:[16]
 Similar to racial composition, the variation in faculty salaries between the historically white institutions and the historically black institutions is vast.[17]
 The district court justified the disparities in racial composition by referring to the shortage of qualified minority applicants for faculty positions.[18] For example, a statistic cited by the district court indicates that from 1977 to 1982, out of 1,067 Ph.D.'s awarded in chemical engineering in the United States, only 6 or less than one percent were awarded to blacks; out of 1,679 Ph.D.'s awarded in electrical engineering, only 29 or less than two percent were awarded to blacks; and in European history, a field included within the social sciences where blacks are generally best represented, out of 1,165 Ph.D.'s, only six or less than one percent were awarded to blacks.[19] Moreover, the district court continued, both businesses and other educational institutions compete for the number of blacks with terminal degrees.[20]
 The district court's explanation cannot, however, be understood without reference to the Board's 1974 Plan of Compliance (the "Plan"). In the late 1960's, the United States Department of Health, Education, and Welfare ("HEW") requested the State of Mississippi and the Board of Trustees to submit a proposal to desegregate Mississippi's university system. The Board responded by submitting the Plan in 1974. The objective of the Plan was to increase the enrollment and employment of minorities at the public universities of Mississippi. The Plan made projections for minority student enrollment and faculty and administration employment for the years 1973-81.
 Significantly, the Plan accounted for matters that the district court found to excuse the Board's failure to hire more minority faculty. The Plan stated that "[t]he projections in regard to faculties of [the historically white institutions] take into account the limited supply of qualified black faculty. Institutions of higher learning throughout the nation, as well as business and industry, are vigorously seeking well-trained and highly qualified black employees."[21] The legislature, however, always under-funded the Plan. Predictably, the Plan did not change the racial composition of the respective faculties or administrations.[22]
 D. Institutional Mission and Academic Programs
 In 1980, the Board began to review all non-doctoral programs to define the role and scope of its public universities. The resulting "mission statements" classified the universities into three categories for funding purposes: comprehensive, urban, and regional. The Board designated Mississippi State University, the University of Mississippi, and the University of Southern Mississippi, historically white institutions, as comprehensive universities. The comprehensive designation meant that these institutions offered a greater number and higher level of degree programs than did the remaining universities and that each institution was expected to offer a number of programs on the doctoral level but not in the same disciplines.
 The only university designated "urban" was Jackson State. Jackson State's role is the service of the urban community, that is, the City of Jackson. Alcorn State University, Delta State University, Mississippi University for Women, and Mississippi Valley State University received the regional designation. The regional designation signifies a more limited programmatic focus. The Board expects each regional institution to restrict course offerings to undergraduate instruction.
 
 
 [1]
 Program Offerings
 The Plan listed the programs available as of 1973-74:
 Historically White Institutions[23]
 
 
 [23]
 See supra note 16 for the meaning of the acronyms
 Bachelors Masters Specialist Doctoral Other Total
UM 62 45 7 28 0 142
MSU 94 68 18 45 0 225
USM 108 73 27 37 0 245
MUW 37 14 9 0 1 62
DSU 34 13 4 0 0 51
Historically Black Institutions
ASU 28 0 0 0 0 28
JSU 38 23 1 0 0 62
MVSU 26 0 0 0 1 27
 The statistics indicate that the three white comprehensive universities offered more programs than the historically black universities. The historically black universities offered only 6.2% or 24 of the 388 graduate programs. The white comprehensive universities offered all 110 doctoral programs. Alcorn State University and Mississippi Valley State University were limited to undergraduate instruction. As of 1986, although change had occurred, this pattern of program offerings remained discernable. The schools ranked as follows regarding total programs offered:
 Total Programs
Mississippi State University 151
University of Mississippi 138
University of Southern Mississippi 124
Jackson State University 73
Delta State University 57
Alcorn State University 39
Mississippi University for Women 27
Mississippi Valley State University 17
 No historically black institution in 1981 or 1986 offered a professional degree in programs such as law, medicine, dentistry, or pharmacy. The historically black institutions, on average, offered fewer graduate programs and fewer fields of study than did the historically white schools, and, had a smaller number of their programs accredited.[24]2. Program Duplication
 After the 1980 review, the Board ordered a substantial decrease in degree programs at both the historically black and the historically white institutions. These reductions affected the unnecessary program duplication existing between the universities. Unnecessary duplication refers to the duplication of programs considered nonessential to a liberal arts education.[25]
 The historically white institutions, however, continue to unnecessarily duplicate programs offered at the historically black institutions. At the bachelors level, the historically white institutions unnecessarily duplicated 34.6% of the 29 programs offered by the historically black institutions as of 1985-86.[26] At the masters level, the historically white institutions unnecessarily duplicated nine of ten programs offered by the historically black institutions during the same period.[27]
 The figures remain approximately the same when the white comprehensive universities are compared to the historically black universities. The district court found that the white comprehensive universities duplicated 32.7% of the programs offered by the historically black universities.[28] And at the masters level, the white comprehensive universities unnecessarily duplicated 86.2% of the program offered by the historically black universities.[29]
 There is also unnecessary duplication between the white comprehensives and Jackson State, the historically black institution with the urban designation. In 1986, Mississippi State University, the University of Mississippi, and the University of Southern Mississippi, each unnecessarily duplicated over 30% of the bachelor's level programs at Jackson State, including degree programs in such fields as Banking and Finance, Social Work, and Law Enforcement.
 Moreover, a considerable amount of unnecessary duplication among the black and white universities remains even if duplication between the comprehensive and noncomprehensive universities is eliminated from the analysis. Thirty-eight percent of the bachelor's level programs at Mississippi Valley were unnecessarily duplicated at Delta State, including degree programs in such fields as Business Management and Administration and Law Enforcement.
 
 
 [3]
 Off Campus Offerings
 The historically white universities opened three off-campus centers in Jackson, Natchez, and Vicksburg, Mississippi near Jackson State University and Alcorn State University during the 1950's and 1960's. The historically white universities' placement of these centers in close proximity to the historically black universities was one aspect of the racially dual system of higher education in Mississippi existing at the time the University of Mississippi was forced to admit James Meredith.[30] In Jackson, the University of Mississippi, Mississippi State, and the University of Southern Mississippi began offering courses at off-campus centers, located near Jackson State University, with the Board's permission, in 1951, 1961, and 1964 respectively. The three centers merged into what is presently the Mississippi University Center (the "University Center") in Jackson in 1966. The Board granted permission to grant degrees in 1972. As of 1981, seventy-six percent of the bachelors degree programs and 90% of the masters degree programs at Jackson State University were also offered at the University Center. Currently, however, Jackson State University enjoys on-campus privileges at the University Center and retains veto authority over all programs offered.[31] The historically white universities offer only limited graduate programs and unique courses.[32]
 In 1962, the University of Southern Mississippi opened a resident center, the Natchez Center, approximately 40 miles from Alcorn State University.[33] The Center initially offered three years of undergraduate work, but the Board subsequently authorized the award of baccalaureate degrees in elementary and secondary education and business administration. These degrees were also offered by Alcorn State.[34] As of 1981, the Natchez Center offered twenty percent of the bachelors degree programs and 66% of the masters degree programs available at Alcorn State. At present, the University of Southern Mississippi offers only noncredit extension courses at the Natchez Center.
 Mississippi State University opened the Vicksburg Center in 1952. The center offered courses for local school teachers. In 1979, the Board authorized Alcorn State to offer several courses at the Vicksburg Center. A consortium arrangement between the two schools was approved the next year.
 E. Funding
 The legislature annually appropriates funds to Mississippi's public universities for basic educational and operating activities. The Board applies a formula to this appropriation to determine the level of support for each institution. The variables in the formula include the number of student credit hours for the previous year, field and level of instruction, and the Board-designated mission of the university. Under this formula, the comprehensive universities receive the most funds per student credit hour; the regional universities receive the least; and Jackson State, the urban university, falls in the middle.
 Historically, the Board under-funded the black institutions to maintain a racially segregated system.[35] As a result, the historically white institutions received and spent more money on a per student basis.[36]
 Average Total Education and General Income Per Student
 1960 1980 1986
Historically White Institutions $1,368 $5,547 $8,934
Historically Black Institutions $ 699 $4,354 $6,171
 Average Total Education and General Expenditures Per Student
 1960 1980 1986
Historically White Institutions $1,351 $5,412 $8,516
Historically Black Institutions $ 718 $4,310 $6,038
 These long term disparities in funding created an accumulated deficit to the disadvantage of the historically black institutions. The funding formula employed by the Board does not, however, account for the historical disparity. Disparities in funding result from the designation of an institution as regional, urban, or comprehensive, with the latter receiving the most funds. But, as the district court stated, the three historically white institutions received the comprehensive designation in 1981. Channeling the most money to the comprehensive institutions thus perpetuated the discriminatory funding practices rebuked by this Court as de jure in 1962.[37]
 F. Facilities
 The district court found that the quality of an institution's facilities affects the administration of its academic programs and its attractiveness to students. From 1964-65 to 1984-85, fulltime enrollment in Mississippi's universities nearly doubled. The district court stated that Mississippi's response to this increase was inconsistent in the early years because the historically white institutions received a disproportionate share of the funds allocated for facility expansion.[38] In addition, the district court did not find any correlation between the racial identity of the institutions and the amount of campus space or the quality of the particular institutions' facilities.[39]
 The district court's findings appear predicated on the testimony of the defendant's expert, who limited his analysis to the amount of space at each of the universities[40] and to the physical conditions of the facilities. The district court did not, however, determine whether the additional funds spent for facilities at the historically black institutions in recent years changed their character since the Brown decision in 1954 when they were considered inferior to the historically white institutions.[41]
 Funds bought more in the earlier years when more money was spent for the white institutions' facilities. According to trial testimony, this funding disparity means that the space at the black institutions was not a generous and lacked the ambiance of the white institutions. Thus the replacement values, the cost of replacing a facility, is useful in determining whether disparities in funding currently exist between the two types of institutions. The replacement values at the historically white institutions still exceed the replacement values at the historically black institutions:
 196465 198485 1964/651984/85
Historically
Black
Institutions
ASU $10,701,096 $49,915,240 $39,214,144
JSU 12,242,349 74,315,678 62,073,329
MVSU 12,229,539 43,837,040 31,607,501
Total 35,172,984 168,067,958 132,894,974
Historically
White
Institutions
DSU $11,992,239 $63,169,993 $51,177,754
MSU 62,245,953 305,721,970 243,476,017
MUW 22,434,678 63,485,898 41,051,220
UM 48,405,525 199,526,432 151,120,907
USM 44,143,743 120,193,938 76,050,195
Total 189,222,138 752,098,231 562,876,093
 II. THE DECISION BELOW
 The scope of a state's duty to eliminate the effects of former de jure segregation in its public universities remains in question. The answer rests upon an interpretation of the Supreme Court's decision in Green v. School Board of New Kent County.[42] The standard implemented by the Green Court places an affirmative duty on states to eliminate all of the "vestiges" or effects of de jure segregation "root and branch."[43] One line of authority has applied this standard in the university context. Norris v. State Council of Higher Education, 327 F.Supp. 1368 (E.D.Vir.1971) aff'd per curiam sub nom. Board of Visitors of the College of William and Mary in Virginia v. Norris, 404 U.S. 907, 92 S.Ct. 227, 30 L.Ed.2d 180 (1971); Geier v. Alexander, 801 F.2d 799 (6th Cir.1986); U.S. v. Louisiana, 692 F.Supp. 642 (E.D.La.1988); Sanders v. Elligton, 288 F.Supp. 937 (M.D.Tenn.1968).
 In the present case, however, the district court applied a different standard based on an alternative reading of Green. This standard requires a state to implement, in good faith, race neutral policies and procedures[44] instead of uprooting the vestiges of segregation root and branch. The district court derived this standard from two decisions; the Supreme Court's per curiam affirmance of a three judge district court in Alabama State Teachers Association v. Alabama Public School and College Authority, 289 F.Supp. 784 (M.D.Ala.1968), aff'd per curiam, 393 U.S. 400, 89 S.Ct. 681, 21 L.Ed.2d 631 (1969) (Douglas, J., dissenting)[45] and the opinion of a five member majority in Bazemore v. Friday, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986).
 The district court in Alabama State Teachers Association, ("ASTA") distinguished between higher education and secondary and elementary education.[46] The ASTA court reasoned that the scope of the state's duty in the face of former de jure segregation should be based on the relatively narrow good faith standard because in the area of higher education, student's themselves choose where to attend college in contrast to elementary and secondary school where attendance is compulsory.[47] In the present case, the district court found support for ASTA's distinction between choice in higher education and compulsory attendance in secondary and elementary education in the Supreme Court's decision in Bazemore v. Friday.[48]
 Bazemore, in part, involved a challenge to the racial composition of the North Carolina Extension Service 4-H and Homemaker clubs. These clubs were segregated by law prior to 1965. The Court held that the existence of single race 4-H and Homemaker clubs did not violate the equal protection clause even though the clubs had a history of de jure segregation.[49] The Court reached this holding because the state had adopted a policy permitting potential members to choose which club to join in response to the Civil Rights Act of 1964.[50] The heart of the Court's five paragraph opinion was based on a comparison to Green.
 Green ... held that voluntary choice programs in the public schools were inadequate and that the schools must take affirmative action to integrate their student bodies. It was the effective predicate for imposing busing and pupil assignment programs to end dual school systems, but it has no application to the voluntary associations supported by the Extension Service. Even if the service in effect assigned blacks and whites to separate clubs prior to 1965, it did not do so after that time. While schoolchildren must go to school there is no compulsion to join 4-H or Homemaker Clubs; and while School Boards customarily have the power to create school attendance areas and otherwise designate the school that particular students may attend, there is no statutory or regulatory authority to deny a young person the right to join any club he or she wishes to join.... And however sound Green may have been in the context of public schools, it has no application to this wholly different milieu.[51]
 Bazemore thus distinguished the compulsory attendance requirement of the elementary and secondary schools at issue in Green from the voluntary membership characteristic of the 4-H and Homemaker clubs. The distinction is predicated on student choice.
 The district court used this distinction to analogize the choice facing the students of the public universities of Mississippi in the present case to the choice facing the students who wished to join 4-H and Homemaker clubs in Bazemore. The students in Bazemore could choose which 4-H or Homemaker club to join and the students in the present case could choose which Mississippi public university to attend.[52] The district court thus held that under the free choice distinction created in ASTA and supported by Bazemore, Mississippi did not violate the equal protection clause. The court reached this holding because Mississippi enacted an open admissions policy similar to the free choice policy enacted by North Carolina in Bazemore.
 III. THE LAW
 A. The Geier Decision
 We reject the district court's reading of Green and adopt the interpretation applied by the Sixth Circuit in Geier v. Alexander.[53] The Geier court held that a state has an affirmative duty to eliminate all of the "vestiges" or effects of de jure segregation, root and branch, in a university setting.[54] The searching inquiry demanded by Geier implies that the federalism and separation of powers concerns involved in finding a state actor liable under the equal protection clause will not prevent a federal court from demanding unitary status in a public university system. This reading of Green punctuates our constitutional mandate to uproot the entrenched results of racial subjugation. The evolution of cases from Plessy v. Ferguson[55] to Brown v. Board of Education[56] requires no less.
 Our endorsement of the Geier Court's rationale is, however, limited. The Geier Court, in deciding to apply Green in the public university forum, distinguished Bazemore. The court stated that:
 While membership in 4-H and Homemaker Clubs offers a valuable experience to young people and families, particularly in rural areas, it cannot be compared to the value of an advanced education. The importance of education to the individual and the interest of the state in having its young people educated as completely as possible indicate clearly that the holding in Green rather than that of Bazemore applies.... Nothing in the Bazemore decision, where the compelling interest of a state in the education of its citizenry was not involved, requires us to reexamine these holdings [Green or Geier v. University of Tennessee ][57]
 This rationale for distinguishing Bazemore is sound to the extent it suggests that Bazemore is factually distinguishable from cases involving the effects of de jure segregation in public universities. The Bazemore majority stated that:
 [t]he district court could find no evidence of any discrimination since that time [the time the open admissions policy was enacted] in either the services or membership and concluded as a matter of fact that any racial imbalance existing in any of the clubs was the result of wholly voluntary and unfettered choice of private individuals.[58]
 The outcome in Bazemore may thus rest on the absence of evidence of discrimination. In contrast, the record in the present case is replete with the disease. The Court in Bazemore only examined an arm, the 4-H and Homemaker clubs, of the body that is the North Carolina university system. This macro-view did not call the Court to the operating table although a micro-view of the case before us, which reveals that the public universities of Mississippi are infected throughout, might prompt major surgery.
 We cannot, however, agree with the Geier rationale to the extent it suggests that potential members of 4-H and Homemaker clubs are any less stigmatized than university students by the stereotypes of racial inferiority conveyed through the effects of de jure segregation. The Geier court justified the holding in Bazemore by arguing that the state's interest in higher education outweighed the value of the experience provided by membership in 4-H and Homemaker clubs.[59] This argument, that a state's duty to eradicate the effects of de jure segregation depends on the importance that the public places on a particular activity, would require this court to create a hierarchy of values at odds with the moral choices inherent in the forerunners of Green: McLaurin, Sweatt, and Brown.[60] These cases demonstrate that law should be society's mirror casting reflections of individual dignity upon all.
 B. The Evolution of Plessy to Brown
 The values embodied in Brown provide the foundation for the searching inquiry demanded by Green in the public university forum. The Brown Court's rubric, that separate is inherently unequal, symbolizes the need for a rule of law to serve as a moral ambition in a society fraught with discrimination. Brown, however, cannot be understood in isolation. A visit with its ancestors, Plessy v. Ferguson, Missouri ex rel. Gaines v. Canada, Sweatt v. Painter, and McLaurin v. Oklahoma is necessary.[61]
 Plessy was an action brought by a black man desiring to sit in a railway car designated for whites only under Louisiana law. The Court held that Louisiana's racially segregative law did not violate the fourteenth amendment.[62] In response to Mr. Plessy's argument, that separate facilities stamped him with a badge of racial inferiority, the Court stated:
 We consider the underlying fallacy of the plaintiff's argument to consist in the assumption that the enforced separation of the two races stamps the colored race with a badge of inferiority. If this be so, it is not by reason of anything found in the act but solely because the colored race chooses to put that construction upon it.... The argument also assumes that social prejudices may be overcome by legislation, and that equal rights cannot be secured to the negro except by an enforced commingling of the two races. We cannot accept this proposition. If the two races are to meet upon terms of social equality, it must be the result of natural affinities, a mutual appreciation of each other's merits and a voluntary consent of individuals.... Legislation is powerless to eradicate racial instincts.[63]
 Plessy is clearly at odds with the history surrounding the fourteenth amendment.
 The defeat of the South in the Civil War brought forth the Second Revolution in America's history, a turbulent era referred to as Reconstruction. Black participation in Southern public life after 1867 was the most radical development of the Reconstruction years, a massive experiment in interracial democracy without precedent in the history of this or any other country that abolished slavery in the nineteenth century.... The transformation of slaves into free laborers and equal citizens was the most dramatic example of the social and political changes unleashed by the Civil War and emancipation.... Reconstruction was not merely a specific time period, but the beginning of an extended historical process: the adjustment of American society to the end of slavery.[64]
 The Civil War altered the mores of our country. Blacks were to be equal to whites. The fourteenth amendment, enacted one year later, was the embodiment of this idea of equality clothing blacks, for the first time, with the fabric of the Constitution.
 The Plessy Court abandoned its constitutional duty to influence the folkways of the South to comport with the mores now enshrined in the fourteenth amendment; mores irreconcilable with the separate but equal rule announced by the Court. This rule reinforced the social stigmatization of blacks with racial separation by force of law. Stereotypes of racial inferiority were perpetuated by galvanizing instead of transforming the perception that whites are superior. The Court stated that it was the perceptions of blacks that created any badges of inferiority when in fact it was Mr. Plessy who was imploring the Court to bridle the racial beliefs of the white majority that he so painfully endured.
 Plessy is thus a decision that maintains the status quo perceptions of a prejudiced society. The Court failed to begin to bring these perceptions in line with the message of the Civil War that blacks were equal to whites. The constitutional rights of the minority did not animate the Court's analysis.
 The constitutional rights of blacks began to expand in part through the notion that discrimination law should serve as a symbol to influence majority values. Missouri ex rel. Gaines v. Canada.[65] In Gaines, the University of Missouri School of Law denied Lloyd Gaines, the plaintiff, admission because he was black. The University informed him that he could attend another institution in an adjacent state at Missouri's expense. Instead, Gaines sued the state for admission.
 The Supreme Court held that Gaines had to be admitted to the School of Law. The Court reasoned that:
 The basic consideration is not as to what sort of opportunities, other States provide, or whether they are as good as those in Missouri, but as to what opportunities Missouri itself furnishes to white students and denies to negroes solely upon the ground of color.... [I]t would nevertheless be the constitutional duty of Missouri when it supplied such courses [in legal education] for white students to make equivalent provision for negroes.... [T]he essence of a constitutional right is that it is a personal one. It is the individual who is entitled to the equal protection of the laws.[66]
 The Gaines rationale differs significantly from the reasoning of Plessy. In Gaines, the Court placed an affirmative duty on the state to redress the constitutional rights of a black student. The Court considered these rights personal to the individual. Unlike the Court in Plessy, the analysis of the Gaines Court was thus animated by a concern for minority rights. This analysis suggests, moreover, that segregation law was beginning to empathize with the perceptions of blacks.
 The eradication of the separate but equal doctrine, initiated by the Gaines Court, continued in two other cases involving university education, Sweatt v. Painter,[67] and McLaurin v. Oklahoma State Regents for Higher Education.[68] The question presented in both cases was: "[t]o what extent does the Equal Protection Clause of the Fourteenth Amendment limit the power of a state to distinguish between students of different races in professional and graduate education in a state university?[69]
 In Sweatt, the University of Texas School of Law denied admission to a prospective law student because he was black.[70] He sued the University and won admission.[71] In response, the University created a law school for black students in the basement of a state office building.[72] The black law school had a "faculty of five full time professors; a student body of 23; a library of some 16,500 volumes serviced by a full time staff; a practice court and a legal aid association; and one alumnus who ha[d] become a member of the Texas bar."[73]
 The trial court found that the school offered "privileges, advantages and opportunities for the study of law substantially equivalent to those offered by the State to white students at the University of Texas."[74] The Supreme Court, however, rejected these findings. The Court stated that:
 we cannot find substantial equality in the educational opportunities offered white and Negro law students by the state.... With such a substantial and significant segment of society excluded, we cannot conclude that the education offered petitioner is substantially equal to that which he would receive if admitted to the University of Texas Law School.... It is fundamental that these cases [addressing race distinctions in graduate education] concern rights which are personal and present.[75]
 McLaurin was decided the same day as Gaines. G.W. McLaurin, a black student, applied to the University of Oklahoma to obtain a doctorate in education.[76] The University prohibited McLaurin from enrolling due to an Oklahoma statute forbidding the operation of a school attended by both blacks and whites.[77]
 McLaurin sued the University for admission.[78] In response, the Oklahoma legislature amended the statute to admit black students under the condition that instruction "shall be given at such colleges or institutions of higher education upon a segregated basis."[79] Although the University admitted McLaurin under this amendment, he wasrequired to sit apart at a designated desk in an anteroom adjoining the classroom; to sit at a designated desk on the mezzanine floor of the library, but not to use the desks in the regular reading room; and to sit at a designated table and to eat at a different time from the other students in the school cafeteria.[80]
 The three judge district court held that this treatment did not violate McLaurin's right to the equal protection of the laws.[81] The Supreme Court reversed. The Court reasoned that:
 [The restrictions] signify that the State, in administering the facilities it affords for professional and graduate study, sets McLaurin apart from the other students. The result is that appellant is handicapped in his pursuit of effective graduate instruction. Such restrictions impair and inhibit his ability to study, to engage in discussions and exchange views with other students, and, in general, to learn his profession.... There is a vast difference--a Constitutional difference--between restrictions imposed by the state which prohibit the intellectual commingling of students, and the refusal of individuals to commingle where the state presents no such bar.... [T]he removal of the state restrictions will not necessarily abate individual and group predilections, prejudices and choices. But at the very least, the state will not be depriving appellant [McLaurin] of the opportunity to secure acceptance by his fellow students on his own merits.... We conclude that the conditions under which this appellant is required to receive his education deprive him of his personal and present right to the equal protection of the laws.[82]
 The operative ideas in Gaines were brought to fruition by Sweatt and McLaurin. The rights of a black individual seeking admission to a white university labeled personal by the Gaines Court were considered the rights of a "significant and other segment of society" in Sweatt.[83] The Sweatt Court thus heeded the message of the Civil War by recognizing the rights of the black minority in their entirety. The implication is that blacks were entitled to complete participation in community life.
 McLaurin developed a critical aspect of this idea by focusing on the intellectual experience of the black student. The Court stated that: "Such restrictions [i.e., the ones isolating McLaurin from the rest of the student body] impair and inhibit his ability to study, to engage in discussions and exchange views with other students, and, in general, to learn his profession."[84] Minority perceptions were at issue reflecting the Court's understanding that the majoritarian regime of separate but equal inflicted messages of inferiority. The reasoning of McLaurin thus differs from the reasoning of Plessy where the Court, condoning the status quo folkways of the white majority, stated that blacks imposed badges of inferiority upon themselves.
 The McLaurin Court's most significant recognition, however, is the possibility of using equal protection doctrine to influence these folkways to correspond with the message of equality wrought by the Civil War. This possibility evolved from the duty placed on the state by the Gaines Court to redress minority rights. The Court in McLaurin stated that: "[t]he removal of the state restrictions will not necessarily abate individual and group predilections, prejudices and choices. But at the very least, the state will not be depriving appellant [McLaurin] of the opportunity to secure acceptance by his fellow students on his own merits."[85] McLaurin thus recognized that constitutional doctrine might alter societal values unlike the Plessy decision which maintained them. In effect, Plessy was dead. The Court in Brown was now free to etch a tombstone for the grave of separate but equal dug by Gaines, Sweatt, and McLaurin.
 Brown transformed the McLaurin Court's suggestion, that equal protection doctrine might alter the perceptions of the white majority, into a constitutional mandate. In contrast to the Court in McLaurin, the Brown Court explicitly recognized that legal segregation caused black students to perceive themselves as inferior: "to separate them [the students] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely to ever be undone."[86] The message was that constitutional doctrine must commandeer a social mission to eradicate the stigma conveyed through racial separation by law. The stigma could be eradicated if the decisions of courts removed the legal barriers supporting racial subjugation thereby serving as moral messages to a white majority permeated with discriminatory values. The separate is inherently unequal rule announced by the Court thus reflects disdain towards the source of the perceptions of black inferiority.
 The discussion of remedies in Brown II[87] illuminates the scope of the rights created in Brown I. The Court in Brown II stated that:
 In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Historically, equity has been characterized by practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of these traditional attributes of equity power. At stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a non-discriminatory basis. To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth .... [in Brown I ]. Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them.[88]
 The remedy in Brown II was derived from the personal interest of the student. Brown I held that the personal interest of the student was based on perceptions of racial inferiority conveyed through the effects of racial separation by law. The remedy, the Court in Brown II held, must therefore remove all the effects of de jure segregation. Otherwise, the perceptions of black students would remain distorted and the moral aspirations of "separate is inherently unequal"--the attainment of human dignity for all--would be impugned. This aspiration is why public disagreement, the disagreement of those pleased by the status quo, was not an obstacle to the Brown II Court.
 C. Green
 The holding in Green[89] cannot be understood without considering Brown I and Brown II. The Green Court held that a state has an affirmative duty to create a unitary school system by eliminating, root and branch, the effects of de jure discrimination.[90] The Court stated that:
 The pattern of separate "white and Negro" schools ... established under compulsion of state laws is precisely the pattern of segregation to which Brown I and Brown II were particularly addressed.... It is of course true that for the time immediately after Brown II the concern was with making an initial break in a long-established pattern excluding Negro children from schools attended by white children. The principle focus was on obtaining for those Negro children courageous enough to break with tradition a place in the "white" schools.... Under Brown II that immediate goal was only the first step, however. The transition to a unitary, nonracial system of public education was and is the ultimate end to be brought about....[91]
 Under Green the creation of a unitary school system is the goal, a goal tantamount to the elimination of the effects of de jure discrimination, root and branch. If a less demanding standard were adopted, images of inferiority would be memorialized with the force of law, contrary to the vision of Brown, because vestiges of discrimination would remain unaddressed. Brown commands the application of Green in all of its fertility to the public university forum.
 By comparison, the district court's application of Green was circumscribed. According to the district court, a state discharges its constitutional responsibility by implementing in good faith, race-neutral policies and procedures.[92] The district court held that the open admissions policy of Mississippi's public universities satisfied this standard.[93]
 The district court reasoned that students themselves choose what college to attend under an open admissions policy in contrast to elementary and secondary schools where attendance is compulsory.[94] This distinction, sustained by Bazemore, is based on student choice, or conversely, that students are not compelled to attend college. It assumes that black students possess the same freedom to choose as do white students. Contrary to Brown, however, this assumption ignores the effects of past de jure segregation.
 The remedial power granted to district courts by Green flows from the concept of stigmatization explicated in Brown. Brown explicitly recognized that vestiges of de jure segregation distort the perceptions of blacks. Blacks do not, therefore, make choices from a tabula rasa. Instead, they choose against a history of racial subjugation with its attendant messages of inferiority. Freedom of choice is not a panacea:
 [t]here is no universal answer to complex problems of desegregation; there is obviously no one plan that will do the job in every case. The matter must be assessed in light of the circumstances present and the options available in each instance.... We do not hold that "freedom of choice" can have no place in such a plan. We do not hold that a "freedom of choice" plan might of itself be unconstitutional, although that argument has been urged upon us. Rather, all we decide today is that in desegregating a dual system a plan utilizing "freedom of choice" is not an end in itself.[95]
 The district court in the present case and the five member majority in Bazemore may also be understood to mean that the searching inquiry of Green applies only if attendance at a particular institution is legally compelled unlike public universities or 4-H and Homemaker clubs. This view of choice, however, is also contrary to Brown. Brown stated that the stigmatizing effects of segregation are not created by legally compelled attendance but rather from the vestiges of legally compelled separation. Thus the lesson of Brown is that the malignancy of apartheid does not vanish in state-sponsored forums simply because attendance is voluntary and admittance race-neutral. Courts must not become anesthetized from gazing too deeply into what some believe is the platonic vision of Bazemore. Bazemore's vision of a state government is one resurrected from a past marred by racial subjugation without the ashes of its fire-laden history to gray the facade. Unfortunately, this vision rests on the blithe assumption that the moral ambition of Brown has been conquered; an egalitarian society where the elixir is choice blended into a grog of neutral admissions policies.
 The most abhorrent implication of the idea that the effects of segregation may vary with the admissions and attendance policies of an institution, however, is that black citizens are demeaned with the quality of chameleons. The color of their skin is presumed to change with the structure of an institution where they will see the world as do whites. Thus, any stigmatization that flows from the racial identity of the institutions could only come from the thinking of blacks themselves because they are assumed to be able to self-desegregate. To this extent, Plessy is resurrected. The Plessy Court stated that:
 We consider the underlying fallacy of the plaintiff's argument to consist in the assumption that the enforced separation of the two races stamps the colored race with a badge of inferiority. If this be so, it is not by reason of anything found in the act, but solely because the colored race chooses to put that construction upon it.[96]
 Unfortunately, racial prejudice in our society has not so receded. Even if unintended, it flows from a chronicle of subjugation once encouraged by the rule of our law.
 These ruminations, however, should not be troubling. The monocular vision of Bazemore does not give cause. For history will not let us arrogate the power to do overtly, what we are confident Bazemore did not do covertly, overrule Brown, Green, and a long line of equal protection cases. If these cases are to die, they at least deserve the dignity of a burial.IV. DISCUSSION
 The defendants have not satisfied their affirmative duty under Green. Green demands the removal of all vestiges of de jure segregation root and branch. The facts in this case, however, demonstrate that roots are spread all over the terrain and that branches create shadows over areas where Brown was supposed to usher in rays of sunshine. The badge of inferiority that marks black institutions has not been removed. As such, there remains in Mississippi's higher educational system vestiges of discrimination which distort the perceptions of black students. The racial composition of the student body is not simply the result of student choice.
 As the district court stated, the Board adopted the minimum ACT requirement in 1962 precisely because of its adverse effects on blacks.[97] This requirement, presently a 15 for automatic admission to a historically white university, continues to impede most blacks.[98] In 1986, only 3 out of 10 black applicants scored 15 or higher on the ACT. The district court's rationale, educational reasonableness is not a justification. More accurate, less discriminatory means to predict the college performance of blacks exist. Yet Mississippi does not consider high school grades and other non-cognitive data in assessing the applications of minority candidates despite the recommendation of the American College Testing program to the contrary.
 The ACT exception for special talents or high risk students, which is more liberal at the historically black institutions, exacerbates the discriminatory effect of the minimum ACT score. The reputation of these institutions as inferior is enhanced because admissions qualifications are not as demanding. The exceptions thus perpetuate segregation to the extent that it is easier for blacks to be admitted to a black school. The integration of the historically white universities is not invited. In fact, we question the extent to which the historically white universities publicize the availability of the exceptions.[99]
 The racial composition of the faculty and administration of the historically white institutions also has a pernicious effect on the perceptions of blacks. The paucity of blacks on the faculty and administration of the white comprehensive universities allows few black role models at what are considered the superior institutions. Instead, black faculty and administrators are more numerous at the black universities which are perceived as relatively inferior.
 The Plan purportedly accounted for the limited supply of black faculty and administrators. By 1986, however, Delta State University, a historically white institution, had the largest percentage of black faculty with five percent. In addition, Alcorn State University and Mississippi Valley State University, historically black institutions, had the smallest percentages of black faculty with doctorates. The Board might have raised the salaries of black faculty and administrators to attract them from the limited pool.
 The academic offerings of the various institutions demonstrates that vestiges of de jure discrimination remain entrenched throughout Mississippi's public universities. As of 1986, Alcorn State University and Mississippi Valley State University, historically black, were two of the three institutions ranking lowest in total programs offered and in number of new programs approved by the Board. And, Jackson State University, the black institution with the regional designation, continues to offer fewer courses than any of the white comprehensive universities. As offerings diminish, however, universities are less likely to develop diverse student bodies or unique reputations.
 The duplication of non-essential courses[100] compounds the problem. The historically white institutions offer a significant number of the undergraduate and masters-level courses offered by the black institutions. This duplication fosters the continued racial identity of the universities to the extent that students may attend either a black or a white institution.
 The historically white universities' placement of branch centers near historically black universities also contributed to the racial identity of the institutions. The branches were a part of Mississippi's de jure plan as of 1962.[101] Their impact is apparent at least through 1981 when the Mississippi University Center offered 76% of the bachelors degree programs and 90% of the masters degree programs offered by Jackson State University. The Natchez Center offered 20% of the bachelors degree programs and 66% of the masters degree programs offered by Alcorn State University in the same year. The centers thus reinforced the racial identity of Jackson State University and Alcorn State University over the 1962-1981 period and probably the current composition of their student bodies.
 Until 1962, the Board also maintained a racially segregated university system by underfunding the historically black institutions.[102] Over time, funding disparities produced an accumulated deficit to the disadvantage of the historically black institutions. The Board's funding formula does not account for this historical deficit. Similar disparities exist in the funding of the physical plants. The Board implicitly endorsed all of these funding practices by implementing the mission designations in 1981.
 The mission designations placed an ostensibly neutral label on each institution. In reality, however, these labels, comprehensive, urban, and regional, served to officially condone the Board's discriminatory funding practices. The white comprehensive universities received the most funding and offered the most courses before the Board implemented the designations in 1981.[103] The designations, based on the resources existing in 1981, were thus objective labels for past discriminatory practices. Perceptions of inferiority were perpetuated under the fiction of educational reasonableness. The hierarchy of the mission designations, with the three historically white institutions labeled comprehensive, reinforced the image of the white schools as the superior institutions of the state.
 Vestiges of de jure segregation permeate the public university system of Mississippi. Admissions policies, the racial composition of the faculty and administration, funding practices, academic offerings, and mission designations all perpetuate a stigma of inferiority. Contrary to the mandates of Brown and Green, a unitary system has not been achieved.
 V. TITLE VI OF THE CIVIL RIGHTS ACT
 In addition to their equal protection claim the plaintiffs'[104] claim relief under Title VI of the Civil Rights Act of 1964[105] and its implementing regulations.[106] Section 601 of Title VI states, in pertinent part, that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."[107] In essence, Title VI prohibits discrimination that violates the equal protection clause of the fourteenth amendment.[108] At trial, the plaintiffs did not succeed with their Title VI claim because the district court held that the defendants did not breach their affirmative duty under Green.
 We disagree. The plaintiffs established an equal protection claim. The remaining question is thus whether there has been any discrimination, in the words of Title VI, "under any program or activity receiving federal financial assistance."[109] The quoted phrase was the subject of the Supreme Court's decision in Grove City College v. Bell.[110]
 The Court in Grove City held that Title VI liability is established only with evidence that discrimination occurred in a program or activity specifically supported by federal funds.[111] If a college received federal money in the area of student loans, for example, Title VI could not be used to prevent discrimination in the area of student admissions. Institution-wide discrimination is thus not actionable under Grove City when federal financing is program specific. The result in Grove City was based on Congressional intent.[112]
 Congressional enactments are often mute regarding important questions of statutory interpretation. When Congress decides to speak clearly, however, we must listen with our ears sharply attuned. On March 22, 1988, Congress overrode the President's veto of the Civil Rights Restoration Act of 1987.[113] In effect, Congress shouted across the park to the Supreme Court: "You misunderstood our intention. We want the term 'program or activity' to mean the whole university, not just the student loan program."
 Originally, in the 1964 Civil Rights Act, Congress did not define the term "program or activity." The Grove City Court's narrow reading of this crucial term, however, moved Congress to reinflate it with the Civil Rights Restoration Act of 1987.[114] The Act states, in pertinent part, that "[f]or proposes of this subchapter, the term 'program or activity' and the term 'program' mean all of the operations of a college, university, or other postsecondary institution, or public system of higher education...."[115]
 This section means that it is possible to establish institution-wide discrimination under Title VI when there is federal financing that is program specific. In this sense, the term "program or activity" encompasses the entire college or university. The present case, however, was tried after the 1984 Grove City decision but before Congress acted in 1988. It must therefore be determined whether Grove City controls the outcome of this case or whether the legislation applies retroactively.
 Retroactive application of a statute is appropriate when Congress enacts the statute to clarify the Supreme Court's interpretation of previous legislation thereby returning the law to its previous posture.[116] This rule flows from two of the Supreme Court's canons of statutory construction. First, subsequent legislation declaring the intent of an earlier statute is entitled to great weight.[117] The Civil Rights Restoration Act was specifically enacted to clarify the Grove City Court's reading of the term "program or activity" in the Civil Rights Act of 1964. The Senate report accompanying the passage of the Act[118] states that the bill was introduced:
 to overturn the Supreme Court's 1984 decision in Grove City College v. Bell.... The legislative history of the statutes in question shows Congress intended institution-wide coverage.... In enacting the four civil rights statutes, Congress intended that each be broadly interpreted to provide effective remedies against discrimination.... Contrary to the view of the Supreme Court that the language common to these statutes [i.e. 'program or activity'] should be given limited interpretation, Congress intended institution-wide coverage and the executive branch has historically insisted upon this view. It was understood at the outset that the task of eliminating discrimination from institutions which receive federal financial assistance could only be accomplished if the civil rights statutes were given the broadest interpretation.[119]
 Second, the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong.[120] In the Civil Rights Restoration Act of 1987 itself, Congress stated that:
 certain aspects of recent decisions and opinions of the Supreme Court have unduly narrowed or cast doubt upon the broad application of ... Title VI of the Civil Rights Act of 1964 and legislative action is necessary to restore the prior consistent and longstanding executive branch interpretation and broad, institution-wide application of those laws as previously administered.
 The Senate Report and the statements surrounding the passage of the Act thus indicate that Congress intended to clarify the effect of the Grove City decision and restore the previous understanding of the words "program or activity" crucial to the efficacy of the civil rights statutes.[121] The Civil Rights Restoration Act of 1987 operates retroactively.
 The district court found that Mississippi's public universities receive federal financial assistance. In addition, we stated that Mississippi violated the equal protection clause by breaching its affirmative duty under Brown and Green. The plaintiffs have therefore established a claim under Title VI.
 VI. A GUIDEPOST ON REMAND
 The Chinese have said that a thousand mile journey starts with one step. During the twelve year history of this case, there were many steps, but no discernable degrees of progress on the road towards unitary status. Unfortunately, this case lingered, loitered, and lulled for more than a decade.
 The fourteenth amendment does not purport to address all areas of life and living. It does, however, set a goal fundamental to the maintenance of a truly democratic society--the removal of racial stigma. Thus even if the roots of prejudice and the effects of segregation run deep, progress is crucial to assure equality for all.
 Freedom of choice is a step, and only that, on the road to this goal. And in Mississippi, although choice is neither spurious nor specious, desegregation is not being achieved. In this regard, the prophecy of Brown, the pragmatism of Meredith, the fertility of Green, and the hesitation of Bazemore are instructive. These cases affirm that true freedom of choice remains real and corporeal. One is reminded of the remark attributed to President Truman, "If it works, don't fix it." The converse, however, is axiomatic, if it does not work, fix it or abandon it.
 But before a unitary status award is made, or even a medal for that honor cast, the court should have the assistance of other disciplines. Psychologists, sociologists, economists, engineers, doctors, and professionals from all relevant areas of learning play a role. Windows must open to ventilate the court room with ideas from the winds of truth. To this end, testimony, depositions, cross examinations and opinions can assist. Only then should the parties come forth with a definite plan for the achievement of unitary status.
 The road to unitary status will not be impassable, but it cannot be negotiated without sacrifice and expenditure of treasure. In this case, however, remember that we have not even seen the road signs for the exit to impossibility. We do not ask that justice be done even though the heavens may fall. But if the stigmatizing effects of desegregation are to be vanquished, even if only in increments, the improvement must be continual. No cessation is permissible until the mandate of Brown is satisfied. Brown prescribed some hesitation as to time, but no hesitation as to result.
 Thus if a diminution of what some might label meritocracy occurs, it cannot excuse loyalty to the nineteenth century ideal signified by the abolition of slavery. We do not want to make a mockery of the rally cry of the 1960's "we shall overcome" as the twenty first century approaches. For only when this hope is realized may the jurisdiction of the federal courts truly be relinquished.
 These words should serve to illuminate the road map that the district court must create to remedy the violation of the equal protection clause in this case. They give hope that any sortie on remand will not be long or bitterly fought. We have held that Brown and Green place an affirmative duty on the state to eliminate all of the vestiges of segregation, root and branch, in the public university forum. Neither this duty nor the command of Title VI has been met. We thus reverse and remand for proceedings not inconsistent with this opinion.
 REVERSED AND REMANDED
 DUHE, Circuit Judge, Dissenting:
 Despite the well-crafted reasoning and artful prose employed by the majority, I find myself in basic disagreement.
 In my view, our decision is controlled by the clear teaching of the Supreme Court in Bazemore v. Friday, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986), and Alabama State Teachers' Association v. Alabama Public School and College Authority, 289 F.Supp. 784 (M.D.Ala.1968), aff'd per curiam, 393 U.S. 400, 89 S.Ct. 681, 21 L.Ed.2d 631 (1969). These cases teach that, where attendance choices are voluntarily made, our Constitution requires that a state discontinue prior discriminatory practices and adopt wholly race-neutral criteria for making the decisions necessary to administer and operate the system. The majority, relying on district and other circuit court decisions, has categorically rejected that teaching and imposed upon the state the same constitutional duty required for primary and secondary education where freedom of choice is unavailable and services are free of charge. In so doing it takes a liberty that is simply not available to courts of appeals.
 The majority has ably distilled the essence of Brown I and II, concluding that "[C]onstitutional doctrine must commandeer a social mission to eradicate the stigma conveyed through racial separation by law." At 749. Yet if the social mission itself is not at issue in this case, the reach of that mission most certainly is. Under current law the mission to eliminate all vestiges of de jure discrimination "root and branch" does not reach the university. If it is contrary to Brown to assume that black students possess the same freedom to choose as white students, as the majority states, a court of appeals is not thereby entitled to circumvent a contrary decision of the Supreme Court which flatly and squarely relies on a student's freedom to choose. Moreover, the majority seeks to extend Green on the very basis--freedom to choose--that the Bazemore Court declined to extend it. Bazemore simply cannot be distinguished on the basis that the record in this case is "replete with the disease [of discrimination];" such analysis merely puts the evidence ahead of the standard.
 Until the Supreme Court teaches otherwise we are bound by its existing pronouncements. The reasons why the rule of Bazemore and Alabama is appropriate in the higher education setting where one has freedom of choice and must bear the cost of that choice are fully explored in those opinions so are not repeated here. I fully subscribe to those reasons. I respectfully dissent.
 
 
 [1]
 Lewis Carroll, Through the Looking Glass and What Alice Found There, Chapter IV, Tweedledum and Tweedledee (1872), reprinted in The Complete Illustrated Works of Lewis Carroll 117 (Guiliano ed. 1982)
 
 
 [2]
 Ayers v. Allain, 674 F.Supp. 1523, 1526 (N.D.Miss.1987)
 
 
 [3]
 Id. at 1564
 
 
 [4]
 The Board, created in 1932, is the governing body of all of the state universities in Mississippi. The Board consists of 13 members. From 1932 to 1972, the members of the Board were all white. At the time of trial in 1987, three of the thirteen members were black
 The governor of Mississippi, with the consent of the Mississippi Senate, appoints twelve members of the Board. Ten must reside in the geographical district that they represent. The other two are chosen at-large from the state. Members serve staggered twelve year terms so that every four years four seats are open for selection.
 In addition, a special seat belonging to the University of Mississippi alone, designated the LaBauve Fund seat, has a four year tenure so that the seat is available at the same time one-third of the Board turns over. The month before the district court issued its opinion, the people of Mississippi abolished by popular vote the LaBauve Fund seat. The governor appointed and the senate confirmed four white trustees and one black trustee for the end-of-term vacancies which occurred in 1972, 1976, 1980, and 1984. For intra-term vacancies, the appointments have always been white trustees.
 
 
 [5]
 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)
 
 
 [6]
 In 1962, Judge Wisdom, writing for our Court, ordered the University of Mississippi to admit a black transfer student named James Meredith. Meredith v. Fair, 305 F.2d 341 (5th Cir.1962). Meredith was a student at Jackson State College when he applied for admission to the University of Mississippi in January, 1961. He sought transfer because he found Jackson State College to be substandard. The University of Mississippi denied his admission application and in response Meredith filed suit in federal district court. Judge Wisdom wrote: "[t]he efforts of the Board of Trustees [of the State Institutions of Higher Learning] and the officials of the University of Mississippi together with various state officials, including the Governor and the Lieutenant Governor of the state of Mississippi, and the Mississippi Legislature to impede and deter efforts to integrate the student body at the University of Mississippi during the 1961-62 school year are well documented."
 
 
 [7]
 Ayers, 674 F.Supp. at 1551
 
 
 [8]
 Id. at 1529
 University of Mississippi ............. 1962
Mississippi State University .......... 1965
Mississippi University for Women ...... 1966
University of Southern Mississippi .... 1967
Delta State University ................ 1966
 
 
 [9]
 * The figure for Mississippi State University for 1973-74 is an average derived from 1972-73 and 1974-75 data because data for 1973-74 are not available
 
 
 [10]
 ** In 1985-86, Jackson State University enrolled 59% black, 13.3% white, and 27.7% other-race pupils. For 1973-74, Mississippi State University and the University of Southern Mississippi are averages of 1972-73 and 1974-75 data because 1973-74 data are not available
 
 
 [11]
 Ayers, 674 F.Supp. at 1555
 
 
 [12]
 The record suggests that the availability of the high risk exceptions at the historically white schools were not well publicized in their recruiting materials. The president of the University of Southern Mississippi testified that he was reluctant to advertise the existence of the exceptions, and that the University of Southern Mississippi did not encourage applicants with less than 15 on the ACT to apply. Students with scores below 15 were automatically rejected. Their record was then reviewed at a later time in the spring or summer to determine if a department had requested a particular student's admission
 The other historically white schools do not appear to admit large numbers of students with ACT scores below 15. In 1986, applicants with less than a 15 composite score on the ACT accounted for approximately nine percent of the entering class at Delta State University; approximately five percent at Mississippi State University; approximately four percent at the University of Mississippi, and zero percent at Mississippi University for Women. In contrast, over 50% of the freshmen admitted to each of the historically black institutions that year scored less than 15 on the ACT.
 
 
 [13]
 In 1985-86, roughly 7 of 10 white high school graduates and 3 of 10 black high school graduates scored 15 or higher on the ACT
 
 
 [14]
 Board exhibit 186 at 6-7 (emphasis added)
 
 
 [15]
 Plaintiff exhibit 350
 
 
 [16]
 Only 60 of the 2,563 faculty employed by the historically white institutions during the 1985-86 school year were black. Yet Dr. Lucious Williams, Assistant Vice Chancellor for Academic Affairs, maintained that the University of Mississippi, from about 1983-86, kept a minority faculty vita bank with about 200 vita on file on an annual basis
 There also appears to be a disparity between the extent of the faculty's education at the historically white institutions and the historically black institutions:
 Historically White Institutions*
 Total % Full Professors % Instructors % with Doctorate
UM 673 25.9% 24.4% 59.0%
MSU 895 42.8 6.5 70.0
USM 675 26.4 12.9 64.4
DSU 203 32.0 20.7 52.7
MUW 129 35.7 14.0 52.7
 Historically Black Institutions**
 Total % Full Professors % Instructors % with Doctorate
JSU 359 22.6% 16.7% 64.9%
ASU 174 10.9 43.1 46.6
MVSU 138 18.8 21.7 42.0
*
 The acronyms for the historically white institutions are: (1) UM for the
 University of Mississippi; (2) MSU for Mississippi State University;
 (3) USM for the University of Southern Mississippi; (4) DSU for Delta
 State University; and (5) MUW for Mississippi University for Women
 
 
 **
 The acronyms for the historically black institutions are: (1) JSU for
 Jackson State University; (2) ASU for Alcorn State University; and, (3)
 MVSU for Mississippi Valley State University
 Historically White Institutions:
 University of Mississippi 1.5%
Mississippi State University 2.3
University of Southern Mississippi 2.4
Mississippi University for Women 1.9
Delta State University 5.0
Historically Black Institutions:
Jackson State University 67.3%
Alcorn State University 67.9
Mississippi Valley State University 73.5
 
 
 [17]
 United States exhibit 694(q)
 Historically White Institutions:
 197980 198687
University of Mississippi $20,794 $30,757
Mississippi State University 21,153 31,957
University of Southern Mississippi 19,817 31,964
Mississippi University for Women 17,836 26,507
Delta State University 17,265 26,213
 Historically Black Institutions:
 197980 198687
Jackson State University $18,047 $26,669
Alcorn State University 16,019 21,291
Mississippi Valley State University 15,546 22,746
 
 
 [18]
 Ayers, 674 F.Supp. at 1563
 
 
 [19]
 Id. at 1537
 
 
 [20]
 Id. at 1538
 
 
 [21]
 United States Exhibit 1 at page 12
 
 
 [22]
 One objective of the Plan was to increase the employment of black administrators. At the historically white institutions, six of the 393 administrators (1.5%) were black at the time of the Plan. In 1983, nine years after the Plan was enacted, the percentage of black administrators for each institution was as follows:
 Historically White Institutions:
 University of Mississippi 2.9%
Mississippi State University 0.7%
University of Southern Mississippi 2.0%
Mississippi University for Women 0.0%
Delta State University 0.0%
Historically Black Institutions:
Jackson State University 94.1%
Alcorn State University 96.7%
Mississippi Valley State University 92.5%
 Moreover, in 1986, at the highest administrative levels, the historically white institutions reported 22 officers, who were all white, despite a turnover of 15 positions since 1981. The historically black institutions had nine black officers and one white officer.
 
 
 [23]
 See supra note 16 for the meaning of the acronyms
 
 
 [24]
 Disparities in program offerings between the historically black institutions and the historically white institutions continued to exist in 1985 and 1986 despite the promise of the Plan to give the historically black institutions priority for new programs. From 1975-86, the historically black institutions ranked lowest in the number of new programs approved by the Board:
 Mississippi State University 22
Mississippi University for Women 17
University of Southern Mississippi 16
Jackson State University 15
Delta State University 15
University of Mississippi 14
Mississippi Valley State University 6
Alcorn State University 2
 Although an institution's refusal or failure to request new programs could affect these rankings, they suggest that the Board did not make an affirmative effort to place new programs at the historically black universities.
 In 1986, the institutions ranked as follows among other criteria:
 Historically White Institutions Historically Black
 Institutions
 Historically White Historically Black
 Institutions Institutions
Criteria UM MSU USM DSU MUW JSU ASU MVSU
------------- ----------------------------------- ---------------------------
Number of 3 1 2 4 7 5 6 8
Bachelor
Programs
Number of 1 2 2 5 7 4 6 7
Graduate
Programs
Total 2 1 3 5 7 4 6 8
Programs
Fields- 2 2 1 4 6 5 6 8
Bachelors
Fields- 2 3 1 5 7 4 5 7
Masters
Fields- 1 3 2 4 -- 4 -- --
Doctorate
Library 3 2 1 6 5 4 7 8
Volumes
Percentage of 2 1 4 3 7 5 5 8
Faculty with
Doctorate
Percentage of 1 2 4 5 8 3 6 6
Faculty with
Degree from
Research
University
Average 1 2 5 4 2 7 5 8
ACT Score
 See supra note 16 for the meaning of the acronyms.
 
 
 [25]
 In contrast, necessary duplication refers to the idea that every campus needs to teach basic courses fundamental to a proper education. Core subjects such as English, Mathematics, and History are thus not counted in determining "unnecessary" program duplication
 
 
 [26]
 Ayers, 674 F.Supp. at 1541
 
 
 [27]
 Id
 
 
 [28]
 Id
 
 
 [29]
 Id
 
 
 [30]
 Id. at 1551
 
 
 [31]
 Id. at 1542
 
 
 [32]
 Id
 
 
 [33]
 Id
 
 
 [34]
 Id
 
 
 [35]
 Meredith took judicial notice of this practice in 1962. Id. at 1551
 
 
 [36]
 Dr. Larry Leslie, the U.S. expert on funding, testified that the predominantly white institutions receive and spend more money on a per student basis. Dr. Leslie's analysis included revenues generated by more recent Board policies and practices which the district court found more favorable to the historically black institutions
 
 
 [37]
 Ayers, 674 F.Supp. at 1551
 
 
 [38]
 Id. at 1547
 
 
 [39]
 Id. at 1561-62
 
 
 [40]
 Id. at 1548-50. The district court focused on square footage per student. Id. This measure, however, does not account for the quality, usefulness, efficiency, or, perhaps most importantly, the aesthetics of a structure. A large warehouse with concrete floors and tin walls may have the same square footage as the British Museum but that does not give the two facilities the same potential to pleasurably exhibit art
 
 
 [41]
 Id. at 1549
 
 
 [42]
 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968)
 
 
 [43]
 Id. at 438, 88 S.Ct. at 1694
 
 
 [44]
 Ayers, 674 F.Supp. at 1554
 
 
 [45]
 In a footnote in his dissent, Justice Douglas stated that the district court's rationale that the duty to desegregate a university system should be more narrow than the duty to desegregate an elementary school system "is on its face an amazing statement as the forerunners of Brown v. Board of Education....were cases involving higher education. See Missouri ex rel. Gaines v. Canada, ... Sweatt v. Painter, ...[and] McLaurin v. Oklahoma State Regents for Higher Education."
 
 
 [46]
 ASTA 289 F.Supp. at 788
 
 
 [47]
 Id
 
 
 [48]
 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986)
 
 
 [49]
 Id. at 407-09, 106 S.Ct. at 3012-13
 
 
 [50]
 Id
 
 
 [51]
 Id. at 408, 106 S.Ct. at 3013
 
 
 [52]
 Ayers, 674 F.Supp. at 1553
 
 
 [53]
 801 F.2d 799 (6th Cir.1986)
 
 
 [54]
 Id. at 804
 
 
 [55]
 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896)
 
 
 [56]
 Id. at 804
 
 
 [57]
 Id. at 805; See Green 391 U.S. at 430, 88 S.Ct. at 1689 and Geier v. University of Tenn., 597 F.2d 1056 (6th Cir.1979)
 
 
 [58]
 Bazemore, 478 U.S. at 407, 106 S.Ct. at 3012
 
 
 [59]
 Geier, 801 F.2d at 805
 
 
 [60]
 Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208 (1938); McLaurin v. Oklahoma State Regents for Higher Educ., 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149 (1950); Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950); Brown, 347 U.S. at 483, 74 S.Ct. at 686. Similarly, we disagree with the three judge district court in United States v. Louisiana, 692 F.Supp. 642, 656 (E.D.La.1988) to the extent, and only to the extent, it borrowed this portion of the Geier analysis to distinguish Bazemore
 
 
 [61]
 Plessy, 163 U.S. at 537, 16 S.Ct. at 1138; Missouri ex rel. Gaines, 305 U.S. at 337, 59 S.Ct. at 233; Sweatt 339 U.S. at 629, 70 S.Ct. 848; McLaurin, 339 U.S. at 637, 70 S.Ct. at 851
 
 
 [62]
 Plessy, 163 U.S. at 550, 16 S.Ct. at 1143
 
 
 [63]
 Id. at 551, 16 S.Ct. at 1143 (emphasis added)
 
 
 [64]
 E. Foner, Reconstruction--America's Unfinished Revolution 1864-1877 xxv-xxvii (1988) (emphasis added)
 
 
 [65]
 305 U.S. 337, 59 S.Ct. 232
 
 
 [66]
 Missouri ex rel. Gaines, 305 U.S. at 349, 59 S.Ct. at 232
 
 
 [67]
 Sweatt, 339 U.S. at 629, 70 S.Ct. at 848
 
 
 [68]
 McLaurin, 339 U.S. at 637, 70 S.Ct. at 851
 
 
 [69]
 Sweatt, 339 U.S. at 631, 70 S.Ct. at 849
 
 
 [70]
 Id
 
 
 [71]
 Id. at 631-32, 70 S.Ct. at 849
 
 
 [72]
 Id. at 632, 70 S.Ct. at 849
 
 
 [73]
 Id. at 633, 70 S.Ct. at 850
 
 
 [74]
 Id. at 632, 70 S.Ct. at 849
 
 
 [75]
 Id. at 634-35, 70 S.Ct. at 850-51
 
 
 [76]
 McLaurin, 339 U.S. at 638, 70 S.Ct. at 852
 
 
 [77]
 Id
 
 
 [78]
 Id
 
 
 [79]
 Id
 
 
 [80]
 Id. at 640, 70 S.Ct. at 853. The University altered the conditions under which Mr. McLaurin attended school in the interval between the decision of the district court and the oral argument in the Supreme Court. The "section of the classroom in which appellant sat was surrounded by a rail on which there was a sign stating, 'Reserved for Colored,' but these have been removed. [At the time of oral argument, McLaurin was] assigned to a seat in the classroom in a row specified for colored students; he [was] assigned to a table in the library on the main floor; and he [was] permitted to eat at the same time in the cafeteria as other students, although here again he [was] assigned to a special table." Id
 
 
 [81]
 Id
 
 
 [82]
 Id
 
 
 [83]
 Sweatt, 339 U.S. at 634, 70 S.Ct at 850
 
 
 [84]
 McLaurin, 339 U.S. at 641, 70 S.Ct. at 853
 
 
 [85]
 Id. at 641-42, 70 S.Ct. at 853-54
 
 
 [86]
 Charles Sumner made a similar argument in 1850 that failed to carry the day. In Brown, Chief Justice Warren attributed the phrase "separate but equal" in Plessy to a Massachusetts case that involved segregated schools in Boston, Massachusetts. Roberts v. City of Boston, 59 Mass. 198, 5 Cush. 198 (1850). In Roberts, Charles Sumner advocated the cause of five year old Sara Roberts before the Massachusetts Supreme Court, over ten years before the Civil War, arguing that Boston's segregation of black children branded them with a stigma of inferiority. Roberts, 59 Mass. at 203-04. In addition, Sumner argued that segregation injured white school children because their "hearts, while yet tender with childhood, are necessarily hardened by this conduct, and their subsequent lives, perhaps, bear enduring testimony to this legalized uncharitableness." See R. Kluger, Simple Justice 75-77 (1977)
 
 
 [87]
 Brown v. Board of Educ., 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (Brown II )
 
 
 [88]
 Id. at 300, 75 S.Ct. at 756. "To that end, the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a non-racial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems." Id. at 300-01, 75 S.Ct. at 756-57
 
 
 [89]
 Green, 391 U.S. at 430, 88 S.Ct. at 1690
 
 
 [90]
 Id. at 437-38, 88 S.Ct. at 1693-94
 
 
 [91]
 Id. at 435-36, 88 S.Ct. at 1692-93. See also Dayton Board of Educ. v. Brinkman, 443 U.S. 526, 537, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979) ("Given intentionally segregated schools in 1954, however, the Court of Appeals was quite right in holding that the Board was thereafter under a continuing duty to eradicate the effects of that system...."); Columbus Board of Educ. v. Penick, 443 U.S. 449, 460, 99 S.Ct. 2941, 2948, 61 L.Ed.2d 666 (1979) ("The Board's continuing affirmative duty to disestablish the dual system is therefore beyond question."); Milliken v. Bradley, 433 U.S. 267, 289-90, 97 S.Ct. 2749, 2761-62, 53 L.Ed.2d 745 (1977) ("More precisely, the burden of state officials is that set forth in Swann [v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) ]--to take the necessary steps to 'eliminate from the public schools all vestiges of state-imposed segregation.' "); Keyes v. School Dist. No. I, Denver, Colo., 413 U.S. 189, 200, 93 S.Ct. 2686, 2693, 37 L.Ed.2d 548 (1973) ("Rather, we have held that where plaintiffs prove that a current condition of segregated schools exists within a school district where a dual system was compelled or authorized by statute at the time of our decision in Brown ... the State automatically assumes an affirmative duty to 'effectuate a transition to a racially nondiscriminatory school system....' ") (citing Brown I, 347 U.S. at 483, 74 S.Ct. at 686); Alexander v. Holmes County Board of Educ., 396 U.S. 19, 20, 90 S.Ct. 29, 29, 24 L.Ed.2d 19 (1969) (per curiam ) ("Under explicit holdings of this Court the obligation of every school district is to terminate dual school systems at once and to operate now and hereafter only unitary schools.")
 
 
 [92]
 Ayers, 674 F.Supp. at 1551-54
 
 
 [93]
 Id
 
 
 [94]
 Id. at 1552-53
 
 
 [95]
 Green, 391 U.S. at 439, 88 S.Ct. at 1694
 
 
 [96]
 Plessy, 163 U.S. at 551, 16 S.Ct. at 1143 (emphasis added)
 
 
 [97]
 Ayers, 674 F.Supp. at 1555
 
 
 [98]
 Mississippi's ACT policy could discourage potential black students from applying to the historically white universities. Cf. Dothard v. Rawlinson, 433 U.S. 321, 330, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977) ("The application process might itself not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory.")
 
 
 [99]
 See supra note 12
 
 
 [100]
 See supra note 25
 
 
 [101]
 Ayers, 674 F.Supp. at 1551
 
 
 [102]
 Id
 
 
 [103]
 Id
 
 
 [104]
 The United States intervened under 42 U.S.C. section 2000h-2 (1989) three months after the private plaintiffs filed their complaint against the state of Mississippi. This provision entitles the United States to the relief that it would have obtained if it had initiated the action
 
 
 [105]
 42 U.S.C. section 2000d et seq. (amended Oct. 21, 1986, Pub.L. 99-506, Title X, section 1003, 100 Stat. 1845; Mar. 22, 1988, Pub.L. 100-259, Title VI, section 606, 102 Stat. 31)
 
 
 [106]
 34 C.F.R. sections 100.1-100.13 (1988)
 
 
 [107]
 42 U.S.C. section 2000d (1981)
 
 
 [108]
 Ayers, 674 F.Supp. at 1551 n. 7
 
 
 [109]
 42 U.S.C. section 2000d-4a (1989) (entitled " 'Program or activity' defined"). We do not have to decide whether the plaintiff's must prove discriminatory intent instead of discriminatory impact. Alexander v. Choate, 469 U.S. 287, 293, 105 S.Ct. 712, 716, 83 L.Ed.2d 661 (1985) (Title VI itself reaches only instances of intentional discrimination although the implementing regulations could allow a disparate impact analysis.). Cf. Guardians Ass'n v. Civil Service Comm'n of the City of N.Y., 463 U.S. 582, 607, n. 27, 103 S.Ct. 3221, 3235, n. 27, 77 L.Ed.2d 866 (1983) (Proof of intentional discrimination is necessary for the recovery of compensatory damages although only proof of discriminatory impact is necessary in a suit to enforce the regulations adopted under Title VI.). Our case involves past intentional discrimination continuing to the present through a breach of the affirmative duty placed on the state by Green
 
 
 [110]
 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984)
 
 
 [111]
 Id. at 570-76, 104 S.Ct. at 1219-23
 
 
 [112]
 Id. at 563-70, 104 S.Ct. at 1216-19
 
 
 [113]
 Pub.L. 100-259, 102 Stat. 28, 42 U.S.C. section 2000d-4a (1988)
 
 
 [114]
 42 U.S.C. section 2000d-4a(2)(A) (1988)
 
 
 [115]
 Id
 
 
 [116]
 See Bonner v. Arizona Dept. of Corrections, 714 F.Supp. 420, 422 (D.Ariz.1989) (Civil Rights Restoration Act of 1987 applies retroactively); United States v. Berg, 710 F.Supp. 438, 442 (E.D.N.Y.1989) ("[W]here Congress clearly indicates its intention to reject a recent Supreme Court interpretation and restore the law to its former state, retroactive application of a newly enacted statute is appropriate."); Leake v. Long Island Jewish Medical Center, 695 F.Supp. 1414, 1417-18 (E.D.N.Y.1988) (Terms "program or activity" in the Civil Rights Restoration Act of 1987 apply retroactively) aff'd, 869 F.2d 130 (2nd Cir.1989); Mrs. W. v. Tirozzi, 832 F.2d 748, 755 (2nd Cir.1987) ("The 1986 amendment in the present case [the Handicapped Children's Protection Act of 1986] simply codifies a congressional purpose long in place which Congress believed the Supreme Court had misinterpreted" so the plaintiffs could bring suit under the Act even though the Act was passed one year after the suit was brought.)
 
 
 [117]
 Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 380-81, n. 6, 89 S.Ct. 1794, 1801-02, n. 6, 23 L.Ed.2d 371, n. 6 (1969); Glidden v. Zdanok, 370 U.S. 530, 541, 82 S.Ct. 1459, 1468, 8 L.Ed.2d 671 (1962) (opinion of Mr. Justice Harlan, joined by Mr. Justice Brennan and Mr. Justice Stewart); Federal Housing Admin. v. Darlington Inc., 358 U.S. 84, 90, 79 S.Ct. 141, 145, 3 L.Ed.2d 132 (1958)
 
 
 [118]
 There was no house report
 
 
 [119]
 S.Rep. No. 100-64, 100th Cong., 2d Sess. 2-5, reprinted in 1988 U.S. Code Cong. & Admin.News 3-7 (bill introduced "to overturn the Supreme Court's 1984 decision in Grove City College v. Bell ... and to restore the effectiveness and vitality of the four major civil rights statutes that prohibit discrimination in federally assisted programs.")
 
 
 [120]
 N.L.R.B. Hendricks County, 454 U.S. 170, 177, 102 S.Ct. 216, 222, 70 L.Ed.2d 323 (1981); N.L.R.B. v. Bell Aerospace, 416 U.S. 267, 274-75, 94 S.Ct. 1757, 1761-62, 40 L.Ed.2d 134 (1974); Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)
 
 
 [121]
 In addition, Public Law 100-259 does not have an effective date, this is unusual