**Irene MOJICA, Plaintiff–Appellee/Cross–Appellant,**

**v.**

**GANNETT COMPANY, INC., owner of WGCI–FM Radio Station, Defendant–Appellant/Cross–Appellee.**

Nos. 91–3921, 92–1104.

United States Court of Appeals, Seventh Circuit.

Argued June 2, 1993.

Decided Sept. 27, 1993.

Armand L. Andry (argued), Oak Park, IL, for Irene Mojica.

Lawrence C. DiNardo (argued), Brenda H. Feis, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Gannett Co., Inc.

Fred Foreman, U.S. Atty., Criminal Div., Chicago, IL, William P. Barr, Office of the U.S. Atty. Gen., Jacob M. Lewis, Marleigh D. Dover, Dept. of Justice, Civil Div., Appellate Section, Washington, DC, for amicus curiae U.S.

Jeffrey Cummings, Davis, Miner, Barnhill & Galland, Cynthia A. Wilson, Chicago Lawyers' Committee, Chicago, IL, for amicus curiae Chicago Lawyers' Committee for Civil Rights Under Law, Inc.

Before BAUER, Chief Judge, and CUMMINGS, CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, KANNE, and ROVNER, Circuit Judges.

MANION, Circuit Judge.

Irene Mojica, an Hispanic female, worked the "graveyard" shift as the overnight disc jockey at a popular Chicago radio station, WGCI–FM, owned by Gannett Company, Inc. In July 1990 she sued Gannett claiming, among other things, sex and national origin discrimination under 42 U.S.C. §§ 2000e–2 (Title VII) and 42 U.S.C. § 1981, because she had never been promoted into a better time slot. A few weeks before the scheduled trial, Congress enacted the Civil Rights Act of 1991, Pub.L. 102–166, 105 Stat. 1071–1099.

The district court applied the new law retroactively, and the jury awarded Mojica compensatory and punitive damages for her national origin discrimination claim. Gannett then filed a Motion for Judgment Notwithstanding the Verdict. The district court ruled on that motion by reversing the punitive damages award—finding insufficient evidence of malice—but otherwise letting the verdict stand. Gannett appeals the district court's failure to grant j.n.o.v. on the jury's finding of discrimination. Mojica cross-appeals on the district court's decision to strike the punitive damages award.

## I. Facts

WGCI–FM is a popular Chicago radio station with programming geared for a black audience. To attract the maximum number of possible listeners, WGCI–FM separates its programming into six air shifts: 1:00am—5:00am (overnight); 5:00am—9:00am (morning drive); 9:00am—2:00pm (mid-day); 2:00pm—6:00pm (afternoon drive); 6:00pm—10:00pm (evening shift); and 10:00pm—1:00am ("quiet storm"). The format for each shift differs depending upon the presumed tastes of expected listeners. For instance, the morning and afternoon drive-time shifts—which attract by far the largest audiences—involve the chatter of the disc jockeys, along with some music, news, and traffic information. The other shifts are music-oriented, with different musical sounds appropriate to the pace and mood of the time of day.

Gannett hired Mojica in 1979, and she held several positions with WGCI–FM and its predecessor, WVON–AM. In January 1987, Mojica became the full-time overnight disc jockey at WGCI–FM. The overnight shift attracted the smallest listening audience and Mojica was paid less than the other disc jockeys at the station. She sought promotion into one of the more lucrative time slots. Between the time Mojica first became the full-time overnight disc jockey and the time she filed suit, five positions became available in non-overnight shifts at WGCI–FM. Four of those positions were filled by black disc jockeys, and one position—the "quiet storm" position which became available in January 1990—was filled by an Hispanic woman, Anna "Coco" Cortez. Mojica remained stuck in the overnight shift.

On July 6, 1990, Mojica filed suit against Gannett in the district court, alleging that she was paid less than male disc jockeys in violation of the Equal Pay Act (29 U.S.C. § 206(d)) and Title VII, and sexually harassed in violation of Title VII. She also claimed that she was denied promotion on the basis of her sex, her national origin, and in retaliation for her complaints of discrimination, in violation of Title VII and 42 U.S.C. § 1981. Discovery proceeded and the district court scheduled trial for early December 1991. But in mid-November, Congress enacted the Civil Rights Act of 1991, thereby amending the prevailing civil rights laws. The district court determined that the new Act applied retroactively. On November 27, 1991, the district court allowed Mojica to amend her complaint to assert claims under the new Act. 779 F.Supp. 94.

Two weeks later, the district court conducted the trial. All of Mojica's claims were tried to a jury. Mojica presented evidence that while she was the overnight disc jockey, five disc jockey positions became available in more lucrative shifts. She applied for each position but the station did not promote her. To prove that the failures to promote were motivated by discriminatory intent, Mojica introduced evidence that she was a popular disc jockey. She also introduced the testimony of Anna "Coco" Cortez, an Hispanic female disc jockey who was hired into one of the positions for which Mojica was passed over. Cortez testified that she was not given the salary which the station promised, and she eventually left her job because of that. Finally, and significantly, Mojica testified that in the winter of 1986, the station's general manager, Marv Dyson, told her that he would not assign her to a non-overnight shift because she was not "a black male." He denied ever making that comment.

The district court gave the jury a combined instruction on Mojica's national origin claims under section 1981 and Title VII. The jury returned a verdict in favor of Mojica on this combined national origin claim, and awarded her $35,000 in compensatory dam-

ages and an additional $125,000 in punitive damages. Mojica failed on all of her other claims. After trial, Gannett filed a motion for j.n.o.v. The district court granted Gannett's motion on the punitive damages award, finding insufficient evidence of malice to support the award. The district court otherwise denied Gannett's motion, and let stand the jury's finding of discrimination and its $35,-000 award to Mojica. Gannett appeals that denial of its motion. Mojica cross-appeals the district court's decision to strike the punitive damages award.

## II. Analysis

In making its decision to apply the new Act retroactively, the district court faced a somewhat uncharted course. Congress had made no definitive statement in the text of the new Act as to whether it should apply retroactively. *See Mozee v. American Commercial Marine Service Co.*, 963 F.2d 929, 932 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 207, 121 L.Ed.2d 148 (1992) ("whether Congress intended prospective or retroactive application of the 1991 Civil Rights Act cannot be deciphered from either the language of the statute or from the legislative history.") Without congressional guidance, the district court was forced to resolve the issue of retroactivity based on existing judicial precedent. But two distinct lines of cases emanated from the Supreme Court of the United States. One line of cases endorsed a presumption in favor of retroactive application unless the statute included a clear legislative statement to the contrary. *See Bradley v. School Bd.*, 416 U.S. 696, 711–712, 94 S.Ct. 2006, 2016–17, 40 L.Ed.2d 476 (1974); *Thorpe v. Housing Auth. of City of Durham*, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1968). A second line of cases rejected retroactivity, and observed a presumption favoring prospective application of newly-enacted statutes. *See* cases cited in Justice Scalia's concurrence in *Kaiser Alum.*

*& Chem. Corp. v. Bonjorno*, 494 U.S. 827, 855, 110 S.Ct. 1570, 1586, 108 L.Ed.2d 842 (1990). Upon reaching this fork in the road, the district court chose the *Bradley–Thorpe* path and applied the Civil Rights Act of 1991 retroactively.

In the time since this case was tried, this court has addressed and resolved the conflicting Supreme Court precedent on the issue of retroactivity in *Mozee* and *Luddington v. Indiana Bell Co.*, 966 F.2d 225 (7th Cir. 1992). Both *Mozee* and *Luddington* concerned the applicability of the Civil Rights Act of 1991 to cases which were pending on appeal when the new Act became effective. In *Mozee*, we extensively discussed the prevailing precedent and concluded that "the Supreme Court has left us with two seemingly contradictory lines of cases...." *Mozee*, 963 F.2d at 935. We resolved this contradiction by establishing a presumption against retroactive application of newly-enacted statutes, stating the general rule that "statutory provisions impacting substantive rights and obligations will not be retroactively applied." *Id.* at 936. We reasoned that "the better and more fair rule is to hold parties accountable for only those acts that were in violation of the law at the time the acts were performed." *Id.* In *Luddington*, we reaffirmed the presumption against retroactivity: "[t]he idea that the law should confine its prohibitions and regulations to future conduct, so that persons subject to the law can conform their conduct to it and thus avoid being punished ... is a component of the traditional conception of the 'rule of law.'" *Luddington*, 966 F.2d at 227–28. We specifically held that "the [Civil Rights Act of 1991] is applicable only to conduct engaged in after the effective dates (plural because several sanctions carry different effective dates) in the Act, at least if the suit had been brought before the effective date." *Id.* at 229–30.[1]

---

1. In his dissent in this case, Judge Cummings observes that this opinion "all but ignore[s]" the Civil Rights Act of 1991, and instead relies on case law dealing with retroactivity. Cummings, J. dissent at 564–65. The problem, however, is not that we ignore the new Act, but that the new Act avoids the issue of retroactivity. We would have preferred to cite the text of the new Act.

But for many reasons expressed in documents other than the statute, Congress chose to be silent on the issue of retroactivity—the issue which the court considers in this opinion. Absent precise language from the new Act, we must rely upon the presumption against retroactivity firmly established in this circuit's case law.

We decided *Mozee* in May of 1992 and *Luddington* one month later.[2] The case now before the entire court was originally argued on October 19, 1992. In his dissent from the decision to rehear this case *en banc*, Judge Cummings describes the disposition of the panel which initially heard this case. *Mojica v. Gannett Co., Inc.*, 986 F.2d 1158, 1159 (7th Cir.1993) (Cummings, J., dissenting from grant of rehearing *en banc* ). To summarize, Judge Cummings took the position that the presumption against retroactivity established in *Mozee* and *Luddington* did not apply to this case. He noted that while those cases were pending on appeal when the new Act passed into law, this case was pending before the trial court. Judge Cummings and a second panel member[3] determined, for reasons essentially set forth in the dissent to the *en banc*, that Congress intended the new Act to apply to all trials taking place after the Act's passage. The proposed opinion was circulated to the full court under Circuit Rule 40(f), and a majority of the court decided to rehear this case *en banc*. *Id.* at 1158.

On rehearing, this case presents several issues. First, because the full court may decide to overrule previous cases, we must decide whether the presumption against retroactivity established in *Mozee* and *Luddington* should remain the law of this Circuit. Second, we must determine whether this presumption against retroactivity applies to cases which were pending in the trial court when the new Act passed into law. Third, we must apply our decision on retroactivity to the case before us. Finally, we must

settle the other issues—unrelated to retroactivity—raised in this appeal and cross-appeal.

## A. Retroactivity.

 The Supreme Court has granted certiorari in a case involving the issue of retroactivity. *Landgraf v. USI Film Products, cert. granted*, — U.S. —, 113 S.Ct. 1250, 122 L.Ed.2d 649 (1993). The rule stated in that case eventually will control the issue in the federal courts.[4] In the meantime, this court has already articulated a general rule concerning retroactivity in *Mozee* and *Luddington*.[5] When sitting *en banc*, the full court has the power to change general rules stated in previous cases. *See Varhol v. National R.R. Passenger Corp.*, 909 F.2d 1557, 1560 (7th Cir.1990). As a practical matter, therefore, the first issue before us is whether the presumption against retroactivity should remain the law of this Circuit.

In his concurrence in *Kaiser*, Justice Scalia discusses the history of Supreme Court precedent relating to retroactivity and expounds the policies against retroactive application of newly-enacted statutes. *Kaiser*, 494 U.S. at 840–59, 110 S.Ct. at 1579–88. At the core of his discussion is the inescapable reality that retroactive application "is contrary to fundamental notions of justice...." *Id.* 494 U.S. at 855, 110 S.Ct. at 1586. This is so because retroactive application often penalizes conduct which was acceptable, at least under the rule of law, when the conduct occurred. General retroactive application diminishes one's ability to conform conduct to the boundaries imposed by law. This does not mean that Congress is prohibited from re-

---

**2.** We denied Rehearing and Rehearing *En Banc* in *Luddington* on September 4, 1992.

**3.** Senior District Judge Frank A. Kaufman (D.Md.), sitting on the original panel by designation, concurred with Judge Cummings' position.

**4.** Other circuits which have considered this issue have concluded overwhelmingly that the new Act does not apply retroactively. *See Gersman v. Group Health Ass'n, Inc.*, 975 F.2d 886 (D.C.Cir. 1992); *Landgraf v. USI Film Products*, 968 F.2d 427 (5th Cir.1992), *cert. granted*, — U.S. —, 113 S.Ct. 1250, 122 L.Ed.2d 649 (1993); *Johnson v. Uncle Ben's, Inc.*, 965 F.2d 1363 (5th Cir.1992); *Vogel v. Cincinnati*, 959 F.2d 594 (6th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 86,

121 L.Ed.2d 49 (1992); *Fray v. Omaha World Herald Co.*, 960 F.2d 1370 (8th Cir.1992); *Hicks v. Brown Group, Inc.*, 982 F.2d 295 (8th Cir. 1992) (en banc); *Baynes v. AT & T Technologies*, 976 F.2d 1370 (11th Cir.1992). *Contra, Reynolds v. Martin*, 985 F.2d 470 (9th Cir.1993) (concluding that the new Act applies retroactively).

**5.** In his dissent, Judge Ripple notes that "it is a significant judicial diseconomy for this court to proceed to judgment" before the Supreme Court renders its decision in *Landgraf*. Ripple, J. dissent at 570. But this circuit has already expended its judicial resources resolving the issue of retroactivity in *Mozee* and *Luddington*. This case involves no more than a straightforward application of those two cases.

troaction. On the contrary, Congress may advance the will of the citizenry, in some circumstances, by changing laws after the fact. But our legal system leaves that authority exclusively to Congress, and places constitutional limits on its exercise. U.S. Const., Art. I, § 9. Courts should not presume retroaction. Instead, absent a clear legislative statement to the contrary, courts should presume that legislation was intended to operate only prospectively. *See Kaiser*, 494 U.S. at 857–59, 110 S.Ct. at 1588.

In *Mozee* and *Luddington* we embraced Justice Scalia's conclusions from *Kaiser*. We see no reason to overturn those decisions. The weight of history and tradition, as well as considerations of fairness, compel us to observe a presumption against retroactive application of newly-enacted statutes. We need not repeat the reasoning displayed in *Mozee* and *Luddington*. Those cases remain the law of this Circuit, and they stand independently in their precedential value.

*B. Mozee, Luddington And This Case.*

■■■■ The historical reason for applying statutes prospectively is to advance "[t]he principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place...." *Kaiser*, 494 U.S. at 855, 110 S.Ct. at 1586. Therefore, courts should look to the time of the conduct giving rise to the claim to determine the statute's applicability. Simply put, if the conduct took place before the statute's enactment, it is not covered; if after, it is covered. In *Luddington* we followed this principle, holding that "the [Civil Rights Act of 1991] is applicable only to *conduct* engaged in after the effective dates ... at least if the suit had been brought before the effective date." *Luddington*, 966 F.2d at 229–30 (emphasis added).

■■■■ Mojica filed her lawsuit on July 6, 1990. The lawsuit necessarily followed in time the conduct upon which it was based; indeed, all of the alleged failures to promote occurred in 1989 and 1990. The new Act became law in November of 1991. That Mojica later amended her complaint to assert the new law does not change the fact that the conduct occurred (and the lawsuit was filed) before the effective dates. Under *Mozee* and *Luddington*, because the conduct giving rise to the claim occurred before the new Act became effective, Gannett is not liable under the new law. Gannett is potentially liable only under the civil rights laws in effect at the time it failed to promote Mojica.

In his dissent from the decision to rehear *en banc*, Judge Cummings took the position that the presumption against retroactivity established in *Mozee* and *Luddington* did not apply to this case. First, he made a distinction between our previous cases and this one: *Mozee* and *Luddington* were pending on appeal but this case was pending before the trial court when the new Act passed into law. Next, he discerned that Congress intended the new Act to apply to trials taking place after the law's passage, regardless of when the conduct giving rise to the claim took place. "[T]he Act is not addressed to employer's conduct, but rather to the conduct of federal judges administering trials under previously enacted civil rights laws." *Mojica*, 986 F.2d at 1162.

But this reasoning assumes that the trial, instead of the time of the alleged discriminatory conduct, is the temporal event which controls the application of the law. This assumption contradicts the holdings of *Mozee* and *Luddington* that the time of the conduct controls liability. It also ignores the reasoning behind those cases—that it would be "unfair to make persons accountable for acts that did not violate statutory laws when they were performed." *Mozee*, 963 F.2d at 939; *accord Luddington*, 966 F.2d at 228. Under Judge Cummings' approach, Gannett could be liable for an alleged discriminatory failure to promote under section 1981, even though the law (section 1981) in effect at the time of the conduct did not prohibit such alleged discrimination. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (former section 1981 excluded claims based on failure to promote or transfer an employee, unless the "promotion rises to a level of an opportunity for a new and distinct relationship between the

employee and employer....").[6]

In theory, a statute may include certain procedural or damage provisions which do not impact substantive rights, and therefore should apply to trials taking place after enactment. *See Mozee*, 963 F.2d at 939 ("it is arguable that courts should apply the procedural and damage provisions in effect at the time of the trial."); *Luddington*, 966 F.2d at 228 ("[p]rocedural innovations not likely to bias a decision systematically in favor of one litigant rather than his opponent can, without serious affront to the values crystallized in the phrase 'rule of law,' be applied to cases pending when the innovations were adopted...."). Indeed, courts are responsible to faithfully apply laws as Congress drafted them; if Congress intended certain non-substantive provisions of a law to apply to pending trials, then courts should so apply them. *See Ex parte Collett*, 337 U.S. 55, 71, 69 S.Ct. 944, 952–53, 93 L.Ed. 1207 (1949) (new rule defining *forum non conveniens*); *Bonet v. Texas Co.*, 308 U.S. 463, 467, 60 S.Ct. 349, 351–52, 84 L.Ed. 401 (1940) (new method of enforcing awards). But this case implicates only two provisions relating to procedure and damages, neither of which should have been applied at the trial. First, the district court allowed the Title VII claims to be tried to the jury, which was not allowed under the former Title VII but is permitted under the new Act. Second, the jury awarded compensatory and punitive damages, which were not recoverable under the previous Title VII.

To allow a jury trial for a case governed substantively by the former Title VII is to ignore the equitable nature of that provision. The amended Title VII allows for jury trials, but that is because of the legal remedies—including compensatory and punitive damages—available under the new law.[7] The previous Title VII allows only equitable remedies, and as long as that substantive law governs a case, the plaintiff has no right to trial by jury. *See Williamson v. Handy Button Mach. Co.*, 817 F.2d 1290, 1293 (7th Cir.1987). Nor does the right to compensatory and punitive damages conferred by the new Title VII apply retroactively. As we stated in *Luddington*, "[t]he amount of care that individuals and firms take to avoid subjecting themselves to liability whether civil or criminal is a function of the severity of the sanction, and when the severity is increased they are entitled to an opportunity to readjust their level of care in light of the new environment created by the change." *Luddington*, 966 F.2d at 229.

In sum, the district court erred by applying the new Act to this case. Because Gannett's alleged failure to promote Mojica—the conduct giving rise to her claim—took place before the enactment of the new Act, the former civil rights laws govern her case. To the extent some provisions of the new Act may apply to pending trials, no such provisions are implicated in this appeal.[8]

6. In his dissent in this case, Judge Cummings continues to assert that the time of the trial, rather than the time of the alleged discriminatory conduct, determines application of the new law. He expresses "wonder" over this court's position that the time of the conduct controls liability, and speculates that this position is rooted in our "imagination." Cummings, J. dissent at 565–66. To the contrary, our position is found in *Mozee* and *Luddington*, two cases which, as Judge Cummings agrees, state the law of this Circuit. *See* Cummings, J. dissent at 564 ("I have never questioned *Mozee* and *Luddington* as binding authority in this circuit.").

7. The new Act makes clear that the right to a jury trial emanates from the availability of compensatory and punitive damages. Section 102(c) states:

 If a complaining party seeks compensatory or punitive damages under this section—(1) any party may demand a trial by jury; and (2) the court shall not inform the jury of the limitations described in subsection (b)(3).
 *See* 42 U.S.C. § 1981a(c).

8. The dissents in this case make the argument that Congress intended the new Act to overrule several Supreme Court decisions, and that we should effectuate that intent. We disposed of the identical argument in *Luddington:*

 it would be naive to suppose that Congress sits to review the interpretive soundness of judicial decisions. Congress is not a judicial body, let alone a body of academic commentators on judicial decisions. When it 'overrules' a Supreme Court decision it is not registering disagreement with the merits of what the Court did; it is laying down a new rule of conduct—ordinarily for the future. Section 1981 dates back to 1866. It is as unlikely that Congress was attempting to restore section 1981 to the

## C. Consequences of Misapplication.

At trial Mojica alleged that Gannett violated federal laws by paying her less than other disc jockeys, by sexually harassing her, and by refusing to promote her because of her sex, her national origin, and in retaliation for complaining about discrimination. The jury found in Mojica's favor only on the national origin discrimination claim. Mojica does not appeal the jury's findings as to the other claims. The question before us, then, is whether the improper application of the new Act requires reversal of the jury's finding of national origin discrimination.

Mojica actually made two national origin discrimination claims: one under Title VII and one under section 1981. The court provided the jury with a combined instruction on that claim, and the jury returned one verdict: that Gannett engaged in national origin discrimination. The jury did not distinguish the statutory basis of the verdict. Therefore it is impossible to know to what extent the jury assessed liability under Title VII as opposed to section 1981.

There are two problems with the jury's combined verdict. First, the jury should not have been allowed to consider the section 1981 claim. In *Patterson*, 491 U.S. at 184–86, 109 S.Ct. at 2377, the Supreme Court held that the former section 1981—the law that governs this case—excluded claims based on the failure to promote or transfer an employee, unless the "promotion rises to the level of an opportunity for a new and distinct relation between the employee and employer...." The amended section 1981 eliminated this requirement, effectively overruling *Patterson*. *See Harriston v. Chicago Tribune*, 992 F.2d 697, 702 n. 3 (7th Cir. 1993). But Mojica's case should have been governed by the former law. Mojica presents no facts showing that the promotions to the more lucrative time shifts would have involved new and distinct relations with Gannett. *See id.* at 702. By allowing Mojica to proceed under the new Act, the district court essentially allowed her to proceed with a new claim which did not exist at the time the challenged conduct occurred.

The second problem with the jury's verdict is that under the former law, the jury should not have been allowed to consider Mojica's Title VII claims. True, under the former law the jury was allowed to make factual findings if Title VII claims were tried with section 1981 claims. *See Handy Button*, 817 F.2d at 1293. But we have already held that the jury should not have considered the section 1981 claims in the first place. Therefore the jury's finding has no force. Even if we were to defer to the jury's factual finding of national origin discrimination, it would be impossible to reconcile the jury's damage award with the former Title VII. Indeed, the jury awarded $35,000 in "compensatory damages." The former Title VII allows recovery only for back pay and provides other equitable remedies. There is no way to determine at this point what portion of the jury's $35,000 damage award was meant to compensate for back pay.

The verdict is beyond rescue. This case must be remanded so that the district court can consider the Title VII discrimination claim. We decline to remand the section 1981 claim. Mojica offers no facts indicating that the promotions involved the opportunity to enter into a new and distinct contractual relationship.

## D. Other Arguments.

### 1. Insufficiency of the evidence.

Under any version of the civil rights laws the plaintiff must prove discrimination. If

---

understanding of its framers as that *Patterson* in cutting back the earlier decisions had restored the statute to its original understanding. The new civil rights act reflects contemporary policy and politics, rather than a dispute between Congress and the Supreme Court over the mechanics of interpretation. *Luddington*, 966 F.2d at 228. We stand by this statement from *Luddington*. Judge Easterbrook has issued a concurring opinion which builds on *Luddington*'s reasoning and develops the law in

this area. We agree with the view stated in his concurrence—certainly, the concurrence is not a "superficial and wooden approach" and it does represent "reality." *See* Cudahy, J. dissent at 569. Like Judge Easterbrook, we follow the rule stated in *Luddington*—that Congress does not sit "to review the interpretive soundness of judicial decisions." *Luddington*, 966 F.2d at 228. What Judge Cudahy calls "manipulation of musty maxims" we prefer to call the law of this circuit. *See* Cudahy, J. dissent at 569.

Mojica did not prove discrimination at the first trial, the district court's failure to apply the proper civil rights laws would not matter. There would be no reason to remand to give Mojica a second chance to prove discrimination. Gannett argues that the evidence was insufficient to support the jury's finding of discrimination. If there was no evidence of discrimination presented at the trial, there is no reason to remand; this case would be over. Therefore, it is necessary to address Gannett's insufficiency argument.

 In any discrimination case, the plaintiff bears the ultimate burden to prove, by a preponderance of the evidence, that his employment was adversely affected by his protected class status. *Kizer v. Children's Learning Center*, 962 F.2d 608, 611 (7th Cir. 1992); *Oxman v. WLS–TV*, 846 F.2d 448, 452 (7th Cir.1988). The plaintiff can meet this burden either by presenting direct evidence of discrimination, *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), or by successfully navigating the course of shifting burdens authorized in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also St. Mary's Honor Center v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). But once the plaintiff prevails before a jury, the method of proof becomes extraneous. *United States Postal Serv. v. Aikens*, 460 U.S. 711, 715–17, 103 S.Ct. 1478, 1481–83, 75 L.Ed.2d 403 (1983); *Mathewson v. National Automatic Tool Co., Inc.*, 807 F.2d 87, 90 (7th Cir.1986). A district court passing on a motion for j.n.o.v. simply asks whether the substantial evidence supports the jury's finding of discrimination. *Id.* We review *de novo* the district court's decision. *Id.*

 Mojica presented evidence of discrimination at the original trial by testifying that Marv Dyson, the station general manager, told her in 1986 that she would not be promoted into a more lucrative shift because she was not "a black male." She also testified that when she told her other superiors of Dyson's comment, they reacted as if Dyson had foolishly revealed a guarded company secret. One even responded: "He said that to you? He is not supposed to say that.

You could charge him with discrimination." Gannett never objected to this testimony. Mojica also introduced evidence that she was a popular disc jockey and that the station had failed to pay another Hispanic woman disc jockey the amount that they had promised her. The district court found that the evidence was sufficient to support the finding of discrimination.

 To determine if there was substantial evidence, we must ascertain "whether the evidence presented, combined with all reasonable inferences that may be drawn from it, is sufficient to support the verdict when viewed in the light most favorable to the party winning the verdict." *Mathewson*, 807 F.2d at 90. We do not make credibility determinations; we leave that to the jury. *Id.* The jury could have believed Mojica's testimony about Marv Dyson's statement. If they believed that testimony, as well as Mojica's other testimony about how the other station supervisors reacted to the statement, the jury could have reasonably inferred that the radio station had a policy against hiring Hispanic females into prime-time disc jockey positions. Gannett never made a bona fide occupational qualification defense; it never argued that being a black male was a necessary qualification for a prime time disc jockey at a radio station with programming aimed at a black audience. Gannett argues simply that Marv Dyson never made the statement. But the jury could have believed Mojica. Because we conclude that the verdict is supported, we need not comment on any of the other evidence Mojica relied on to prove discrimination.

### 2. Mojica's cross-appeal.

Mojica cross-appeals, arguing that the district court incorrectly overturned the jury's punitive damages award. The district court determined that there was insufficient evidence of malice to support the award of punitive damages. We agree. But in accordance with our decision on retroactivity, we affirm the district court's decision to strike punitive damages because under the former Title VII—which applies to this case—Mojica is not entitled to punitive damages.

## III. Conclusion

The district court erred by applying the Civil Rights Act of 1991 retroactively to this case. We reverse the jury's verdict and remand for a bench trial solely on the issue of whether Gannett committed national origin discrimination under the former Title VII. If so, the district court should award appropriate damages.

REVERSED AND REMANDED.

EASTERBROOK, Circuit Judge, with whom BAUER, Chief Judge, joins, concurring.

Our case is governed by the venerable rule that substantive changes in the law apply prospectively unless Congress expressly says otherwise. *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208–09, 109 S.Ct. 468, 471–72, 102 L.Ed.2d 493 (1988); *Bennett v. New Jersey*, 470 U.S. 632, 639–40, 105 S.Ct. 1555, 1559–61, 84 L.Ed.2d 572 (1985). *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801). Congress did not say otherwise expressly or even by clear implication, and I therefore join the majority's opinion.

Judge Cummings' dissenting opinion, rejecting the rationale of *Reynolds v. Martin*, 985 F.2d 470, 473–74 (9th Cir.1993), concedes that Congress did not make an explicit decision. What then entitles Mojica to the benefits of the Civil Rights Act of 1991? The answer, according to the dissent, is that Congress did not change the law. It simply "overruled" some maverick decisions, including *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), restoring the law to its true state. Because "Gannett's conduct was illegal under 42 U.S.C. §§ 1981 and 2000e until the Supreme Court decided *Patterson*" (dissent at 565), we need not worry about retroactivity. The majority adopts the reasons *Luddington v. Indiana Bell Telephone Co.*, 966 F.2d 225, 228–29 (7th Cir.1992), gave for rejecting a similar argument. Everything *Luddington* said on the topic is persuasive. I write separately to add a few thoughts in light of the weight the dissenting opinion accords to this subject.

Committee reports and articles in law reviews often speak of Congress "overruling" the Supreme Court, but like many a term chosen for rhetorical rather than analytical purposes the usage is ambiguous. Does it mean "The Supreme Court misunderstood the statute in force when it acted"? or does it mean "The legal rule the Supreme Court found in the existing statute is not the rule we prefer"? The former implies that the "overruling" statute regulates events that occurred before its enactment, for the new law ensures continuing operation of a rule that has been on the books all along. The latter implies prospective application, just like any other change in the law. Congress often concludes that existing rules are inadequate and provides new ones that it thinks superior. That the inadequacies in the existing statutes have been revealed by judicial decisions, rather than by the plaints of lobbyists, does not imply that a revision in the text of the United States Code is anything other than a spanking new rule of law.

*Patterson* and the other decisions "overruled" by the 1991 Act interpreted statutes dating as far back as the Civil Rights Act of 1866. When rejecting the result of *Patterson*, Congress and the President did not offer deeper insight into the text or structure of the 1866 Act, which does not speak to promotions—indeed, scarcely speaks to private conduct. Until 1968 judges uniformly understood the 1866 Act as limited to state action—requiring states to offer the same legal remedies to all citizens (so that black and white citizens had identical capacity to form and enforce contracts), but not requiring private parties to make contracts on particular terms, or at all. See *The Civil Rights Cases*, 109 U.S. 3, 16–17, 3 S.Ct. 18, 24–26, 27 L.Ed. 835 (1883); *Corrigan v. Buckley*, 271 U.S. 323, 331, 46 S.Ct. 521, 524, 70 L.Ed. 969 (1926); *Hurd v. Hodge*, 334 U.S. 24, 31, 68 S.Ct. 847, 851, 92 L.Ed. 1187 (1948). *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), gave the part of the 1866 Act that now appears in 42 U.S.C. § 1982 a broader reading, covering much private action. It was roundly criticized, not only by Justice Harlan in dissent, *id.* at 449–80, 88 S.Ct. at 2208–23, but also by legal historians, for misreading both the text

and background of the 1866 Act. E.g., Charles Fairman, VI (1) *History of the Supreme Court of the United States: Reconstruction and Reunion 1864–88* 1207–60 (1971); Gerhard Casper, *Jones v. Mayer: Clio, Bemused and Confused Muse*, 1968 Sup.Ct.Rev. 89. Eight years later *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), extended *Jones* to litigation under § 1981. Four Justices wrote separately to wrestle with an important issue of *stare decisis:* should *Jones,* which they considered wrongly decided, be extended? Justice Stevens began: "For me the problem in these cases is whether to follow a line of authority which I firmly believe to have been incorrectly decided." 427 U.S. at 189, 96 S.Ct. at 2603. Two Justices (Powell and Stevens) answered yes; two (White and Rehnquist) answered no. Chief Justice Burger and Justice Blackmun, who joined the Court after *Jones,* did not communicate their view of that opinion's interpretation of the 1866 Act.

After *Runyon* held that § 1981 applies to private and public contracts alike, intermediate courts had to decide what this means in practice. When asking questions such as "Does a failure to promote an employee because of that employee's sex violate § 1981?", federal judges no longer returned to the materials from 1866. Instead they asked about the reasoning of *Jones* and *Runyon.* How far had the Supreme Court gone? What were the Justices likely to instruct them to do next? Neither *Jones* nor *Runyon* dealt with promotions or discharges; indeed, neither dealt with discrimination on account of sex or national origin. Several courts of appeals held after *Runyon* that a failure to promote an employee because of that person's sex was actionable; the fourth circuit disagreed. 805 F.2d 1143 (1986). *Patterson* became a *cause célèbre* because, after granting certiorari to resolve the conflict and hearing oral argument, the Court requested briefs and reargument on the question whether *Runyon* should be reconsidered. 485 U.S. 617, 108 S.Ct. 1419, 99 L.Ed.2d 879 (1988). Because *Runyon* depended on *Jones,* the order called into question the application of the whole 1866 Act to private action. In the event, the Court over-

ruled neither *Runyon* nor *Jones*—but it also declined to extend them. It said that *Runyon* itself was as far as it was willing to take the holding of *Jones.* Section 1981 establishes equal rights to "make and enforce" contracts; adopting rules for modifying and ending contracts is a legislative task, the Court concluded.

Congress accepted the invitation but encountered problems in the details. It is easy to say that discriminatory failure to promote should be actionable, but does this mean that employees must use administrative remedies (as under Title VII), or may they proceed straight to court as under the 1866 Act? What statute of limitations will apply—the short federal one under Title VII, or the longer state rules under § 1988? What remedies are available—back pay as under Title VII, or compensatory and punitive damages? What price can the opponents of any change extract? The 1991 Act contains compromises on many topics. The compromises were essential to its enactment. Both the nature of the question before the Court in *Patterson* and the nature of the legislative response show that Congress did not "overrule" *Patterson* in the sense of concluding that *Patterson* misunderstood the Civil Rights Act of 1866. The true meaning of that Act was not even before the Court (unless it was prepared to revisit *Jones* ); and once we pass from interpreting the law to interpreting prior judicial decisions, there is no easy answer to the question whether and how far a judge should press cases such as *Jones* and *Runyon.*

Nothing that Congress enacted offers a superior reading of the 1866 Act. What some Senators and Representatives may have thought about the original meaning of § 1981 does not matter; only what the political branches of the government *agreed on* is law. Congress and the President did not agree that *The Civil Rights Cases* and all other opinions interpreting that statute during the first 102 years of its existence were wrongly decided and that Charles Fairman got his history wrong, that the serious debate in *Jones* and *Runyon* about the meaning of the 1866 Act and the scope of *stare decisis* was all pointless. Congress and the Presi-

dent jointly resolved a complex contemporary debate about how employers should behave, and what remedies are available if they do not.

Revisiting the merits of judicial decisions is not part of a legislator's job description. Congress legislates, writing laws rather than rewriting history. The political branches of government altered the text of § 1981 (and several other laws) in order to alter legal obligations and penalties. Cf. *Robertson v. Seattle Audubon Society,* —— U.S. ——, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992). The inability of legislative and executive branches to agree whether these new rules and penalties apply to employment decisions predating November 21, 1991, bucks the question to the judicial branch. And our branch of government has a rule governing such situations, a rule forged early in the nation's constitutional history and applied, with rare exceptions, for 200 years.

The difference between legislative and judicial roles in government supplies the answer to the dissenting opinion's observation that "[i]f we can tolerate retroactive application of court decisions, we should be able to tolerate retroactive application of statutes that overrule those decisions" (dissent at 567). *Patterson* was not "retroactive" in any interesting sense; it did not overrule any earlier opinion. It simply declined to extend *Runyon.* This meant, of course, that courts taking § 1981 for all it could be worth had not read their tea leaves correctly, but resolving a conflict among the circuits in a particular fashion does not effect a retroactive "change" in the law. There was only one law, the 1866 Act, although there were divergent views about its meaning. So far as inferior courts within the federal judiciary are concerned, *Patterson* gives the one right meaning of § 1981, as it stood between 1866 and 1991.

Litigants adversely affected by *Patterson* would not care about the difference between a failure to extend *Runyon* and a retroactive overruling of *Runyon,* but the judicial task is to carry out the law, not what people hope

the law is. *Patterson* interpreted a statute that had been on the books for 123 years. Courts apply their interpretations to pending cases because the rule they are interpreting predates the parties' acts. Judicial interpretations "change the law" from (losing) litigants' perspective, but from the judicial perspective the process of interpretation aims at getting as close as one can to a meaning that predates the litigation. See *Harper v. Virginia Department of Taxation,* —— U.S. ——, —— - ——, 113 S.Ct. 2510, 2516–18, 125 L.Ed.2d 74 (1993); *James B. Beam Distilling Co. v. Georgia,* —— U.S. ——, —— - ——, 111 S.Ct. 2439, 2442–45, 115 L.Ed.2d 481 (1991); *American Trucking Associations, Inc. v. Smith,* 496 U.S. 167, 201, 110 S.Ct. 2323, 2343, 110 L.Ed.2d 148 (1990) (Scalia, J., concurring), *id.* at 209–24, 110 S.Ct. at 2347–56 (Stevens, J., joined by Brennan, Marshall & Blackmun, JJ., dissenting).

Today we apply the 1866 Act to events that occurred while its original text was in force. Congress concluded that a different rule would best serve the nation in the future. Our part is to apply each statute to decisions taken during its reign.

CUMMINGS, Circuit Judge, with whom CUDAHY and ILANA DIAMOND ROVNER, Circuit Judges, join, dissenting.

The majority offers a thoughtful and well-reasoned discussion of retroactivity cases, and if these cases could resolve the issues in Gannett's appeal I would join today's decision without reservation. However, the inquiry before us begins with a statute, the Civil Rights Act of 1991, which the majority has all but ignored.[1] The narrow issue presented here is whether Congress intended an enactment governing damage calculus and burdens of proof in discrimination cases to apply in future civil rights trials. The broader issue is whether *Mozee v. American Commercial Marine Service Co.,* 963 F.2d 929 (7th Cir.1992), and *Luddington v. Indiana Bell Telephone Co.,* 966 F.2d 225 (7th Cir. 1992), were correctly decided. I agree that "Courts should not presume retroaction" ab-

1. Pub.L. No. 102–166, 105 Stat. at 1071 (hereafter referred to as "the Act," and cited by statute and page number only).

sent clear evidence of Congress' intent—but the Act's language and structure show that Congress intended it to apply to Mojica's trial. Therefore I respectfully dissent from the majority's conclusion on the narrow issue posed above. I have never questioned *Mozee* and *Luddington* as binding authority in this circuit. *Mojica v. Gannett Co.*, 986 F.2d 1158, 1165 (7th Cir.1993) (Cummings, J., dissenting from the rehearing *en banc*). Since the majority treats *Mojica* as a referendum on those cases, however, it is appropriate to comment on an approach to the Act that those decisions may not have considered.

The genesis of today's dispute is easier to explain than the Supreme Court's decisions on retroactivity law—and hopefully that Court is poised to resolve the tension between *Bradley v. Richmond School Board*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 and *Bowen v. Georgetown Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468, 471–72, 102 L.Ed.2d 493. See *Landgraf v. USI Film Products*, 968 F.2d 427, and *Rivers v. Roadway Express*, 973 F.2d 490, certiorari granted, —— U.S. ——, 113 S.Ct. 1250, 122 L.Ed.2d 649 (cases consolidated). The majority reads *Mozee* and *Luddington* to establish two propositions: first, that Congress expressed no intent about how the Act should apply to pending cases; and second, that the Act makes substantive changes in federal anti-discrimination laws that would be unfair to apply retroactively to conduct that occurred before the Act became law. In my view the Act (which after all is superior authority) points to a rather different conclusion in both areas.

True, the Act does not give perfect or complete instructions on the retroactivity issue, but this does not mean that the Act is silent on how it should apply to pending cases. The Act's language and structure suggest that while Congress could not agree whether the Act would apply to cases pending on appeal, it surely intended the Act to apply to new civil rights trials such as this. *Mozee* and *Luddington* do not bar the Act from applying here because where congressional intent is clear it controls, and there is no need to presume that the Act is prospective. *Kaiser Aluminum & Chemical Co. v.*

*Bonjorno*, 494 U.S. 827, 837, 110 S.Ct. 1570, 1576–77, 108 L.Ed.2d 842. My conclusion that the Act applies on its face to pending trials also draws support from the Act's focus on trial procedures, which typically take effect upon enactment without regard to the timing of underlying conduct.

The majority initially errs by forgetting that in Mojica's case, the Act did not create a new cause of action for intentional discrimination. *Harvis v. Roadway Express*, 973 F.2d 490, 495 (6th Cir.1992), certiorari granted *sub nom. Rivers v. Roadway Express*, —— U.S. ——, 113 S.Ct. 1250, 122 L.Ed.2d 649 ("the elements of a cause of action under § 1981 are identical to those under Title VII"). Mojica charged that Gannett denied her a more remunerative disk jockey shift because she was an Hispanic woman—and since a jury believed her we may assume that Gannett intentionally discriminated against Mojica. Discriminatory "shift assignments" or "failures to promote" have been illegal for decades. Gannett's conduct was illegal under 42 U.S.C. §§ 1981 and 2000e until the Supreme Court decided *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132. Between 1989 and 1991, Gannett's conduct was illegal only under Title VII (§ 2000e). Since the 1991 Act became law, the conduct is once again also illegal under § 1981. The obvious point here is that the Act did not identify new *conduct*—the majority's emphasis—as illegal. Gannett's treatment of Mojica was unlawful before and after the Act was passed, and therefore holding Gannett liable would not make it "accountable for acts that did not violate statutory laws when they were performed" (Maj.Op. at 558). So when the majority asserts that "the time of the alleged discriminatory conduct [and not the time of trial] is the temporal event which controls the application of the law," (Maj.Op. at 558), it is fair to wonder just where this idea comes from—for the Act does not say this, and Congress' intent rather than our own imagination should control this case.

Turning then to the issue of Congress' intent, much of the Act resurrects remedies and procedures that had been undone by a well-publicized series of Supreme Court deci-

sions in the late 1980s. Bluntly put, Congress passed the Act to overrule certain Supreme Court interpretations of civil rights law. The Act's first page disapproves of *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733, by name and states that the Act aims "to respond to recent decisions of the Supreme Court * * *." 105 Stat. at 1071. The House Report on the Act provides an even more graphic description of the statute's purpose. Its table of contents reads (section by section): "The Need to Overturn *Wards Cove* * * * The Need to Overturn *Price Waterhouse* * * * The Need to Overturn *Martin v. Wilks* * * * The Need to Overturn *Lorance* * * * The Need to Address *Crawford Fittings* * * * The Need to Address *Zipes* * * * The Need to Address *Marek* * * * The Need to Address *Jeff D.* * * * The Need to Overturn *Patterson* * * *."[2] H.R.Rep. No. 102–40(I), 102d Cong., 1st Sess. 1–3, *reprinted in* 1991 U.S.C.C.A.N. 549, 550–551. The Act works as a repudiation of Court decisions that had narrowed the scope of civil rights laws.

To say that Congress intended to overturn a group of cases may not tell us when, precisely, the overruling takes effect. But it tells us something. The act of overruling a case is not silent indifference as to whether that case is good law, nor is it tacit approval of the case's authority over future litigants. *Butts v. City of New York*, 990 F.2d 1397, 1407 (2d Cir.1993) ("restorative language and intent [are] * * * one means of discerning congressional intent as to retroactivity"); *Reynolds*, 985 F.2d at 474–475. The Act accompanies its reversal of Supreme Court decisions with language that applies on its face to trials without reference to conduct. Sections 102, 104 and 105, for example, detail procedures and remedies to be used in future civil rights trials. Section 3 states that the Act aims to "provide statutory guidelines for

the adjudication of disparate impact suits." Section 105(a) restores "the law as it existed on June 4, 1989, with respect to the concept of 'alternative employment practice.'" (*Wards Cove* was decided on June 5, 1989). If these sections are to take effect upon the Act's enactment, as Section 402 decrees, they should apply to new trials because they concern "guidelines for adjudication" and not conduct. All of this, I submit, is enough to reject the majority's decision that Congress was silent on how the Act should apply to new trials. Therefore *Mozee*'s presumption that the Act is prospective cannot apply to Mojica's post-Act trial. *Mojica*, 986 F.2d at 1162–1165 (Cummings, J., dissenting).

The harder question is whether Congress' intent to overrule a group of cases signals that the Act should be applied retroactively to all pending cases, and not just to new trials—and hence whether *Mozee* and *Luddington* were wrongly decided. On the one hand, just as Congress did not say anything about conduct, neither did it say anything about retrying cases that had been decided under the pre-Act regime of procedures and remedies decreed by the Supreme Court. This is the weakness of the Ninth Circuit's reasoning in *Reynolds*, 985 F.2d at 473–474; just because Congress said that two of the Act's provisions apply prospectively does not mean that Congress meant the rest of the Act to apply retroactively. Congress could as easily have meant that it would express no opinion on the rest of the Act. And "retroactive application across the board would produce massive dislocations in ongoing litigation," *Luddington*, 966 F.2d at 229, whereas applying new procedures and remedies to new trials would produce no dislocations whatsoever.

On the other hand, this Court has recognized that "we have an obligation to give statutes their proper meaning rather than to

---

**2.** *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733; *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268; *Martin v. Wilks*, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835; *Lorance v. AT & T Technologies, Inc.*, 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961; *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385; *Independent Federation of*

*Flight Attendants v. Zipes*, 491 U.S. 754, 109 S.Ct. 2732, 105 L.Ed.2d 639; *Marek v. Chesney*, 473 U.S. 1, 105 S.Ct. 3012, 87 L.Ed.2d 1; *Evans v. Jeff D.*, 475 U.S. 717, 106 S.Ct. 1531, 89 L.Ed.2d 747; *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132. *Estate of Reynolds v. Martin*, 985 F.2d 470, 475 n. 2 (9th Cir.1993), explains how the Act overrules these decisions.

perpetuate the effects of our own mistakes." *Kinney v. Pioneer Press*, 881 F.2d 485, 491 (1989). This adage argues that Congress' intent to overrule cases should apply retroactively to all cases pending when the Act became law. If *Kinney*'s admonition is taken seriously, we should explain why the ordinary meaning of "overturn" becomes subject to complex qualifications when the Act decrees that courts mistakenly interpreted civil rights law.[3]

When Congress overturns a recent court interpretation of a statute, this could raise a presumption that Congress intended its action to apply retroactively—with the same effect as a reversal by a higher court. Other circuits applied this reasoning to the Civil Rights Restoration Act of 1987, Pub.L. No. 100–259 § 2, 102 Stat. 28 (1988), which overruled *Grove City v. Bell*, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516. *Lussier v. Dugger*, 904 F.2d 661, 664–665 (11th Cir.1990); *Ayers v. Allain*, 893 F.2d 732, 754–755 (5th Cir.1990), vacated on other grounds *sub nom., United States v. Fordice*, — U.S. —, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992) ("Retroactive application of a statute is appropriate when Congress enacts a statute to clarify the Supreme Court's interpretation of legislation thereby returning the law to its previous posture"). Such a presumption could be rebutted if the statute stated that it applied prospectively. Because most legislation does not aim to overturn court decisions, *Mozee*'s presumption that statutes apply prospectively would remain the general rule for all the persuasive reasons offered in that opinion. 963 F.2d at 936.

Surprisingly, perhaps, *Luddington* offers a theory to support the presumption proposed above. *Luddington* explains our general rule that statutes apply prospectively and court decisions apply retroactively as follows:

> [Without these presumptions] litigants might lack adequate incentives to seek legal change through the courts and courts might feel too free to make such changes * * *. Moreover, the power of a court to disturb settled expectations is held in check by the judicial tradition of incremental change and by the limited control that judges exercise over taxing and spending. A legislature has awesome power uncabined by a professional tradition of modesty and this power is held a little in check by the presumption that its handiwork is to be applied only to future conduct.

966 F.2d at 228. This is perfectly correct (except perhaps the remark about modesty)—but it is irrelevant when Congress overrules a court decision because such an enactment involves the same powers as those exercised by a court. When a new statute only changes the procedures and costs of litigation—as does the Act—the effect of retroactive application on parties' incentives and settled expectations is the same as if a higher court had made the decision. The Act is not an exercise of Congress' awesome power to tax and spend. If we can tolerate retroactive application of court decisions, we should be able to tolerate retroactive application of statutes that overrule those decisions as well.[4]

**3.** Our account should probably go beyond a poker-faced denial that congressional overrulings exist. "When [Congress] 'overrules' a Supreme Court decision it is not registering disagreement with the merits of what the Court did; it is laying down a new rule of conduct—ordinarily for the future." *Luddington*, 966 F.2d at 228. This statement jars because the Act does not lay down new rules of employer conduct, and it registers express disagreement with what the Court did. See William N. Eskridge, *Overriding Supreme Court Statutory Decisions*, 101 Yale L.J. 331 (1991), for analysis of how often and why Congress overrules court decisions. Recent statutes that expressly disagree with "what the Court did" include the Older Workers Benefit Protection Act, Pub.L. No. 101–143 § 101, 104 Stat. 978 (1990), and the Civil Rights Restoration Act, Pub.L. No. 100–259 § 2, 102 Stat. 28 (1988).

**4.** The concurrence's discussion of the original understanding of the 1866 Civil Rights Act fails to persuade me that congressional overrulings should be treated differently from judicial overrulings. Since *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), it has been "the province and duty of the judiciary to say what the law is." I completely agree that when Congress overruled *Patterson*, it was not debating the original meaning of § 1981—it was decreeing that § 1981 would mean what courts had said it meant before *Patterson*. The probative evidence of intent here is that the Act contradicted *Patterson*, and the propriety of deferring to the Act's view is neither enhanced nor diminished by the antiquity of § 1981. See Section 105(a), 105 Stat. at 1074 (restoring "the law as it existed on June 4, 1989"—one day prior to *Wards Cove*).

Presuming that congressional overrides are retroactive also avoids the somewhat unfair results of *Mozee* and *Luddington* noted by Judge Cudahy's dissent in *Mozee.* 963 F.2d at 940–941. *Patterson* changed the law to deny relief for plaintiffs such as Mozee and Mojica who complained of conduct that violated § 1981 when it occurred.[5] When these claimants were before us we ignored the time of conduct and applied *Patterson* retroactively. *McKnight v. General Motors,* 908 F.2d 104, 107 (1990). After Congress restored § 1981 to its pre-*Patterson* position, however, we emphasized the time of conduct, applied a prospective presumption and denied relief again. *Luddington,* 966 F.2d at 228. Courts should avoid decisions that appear to create "heads I win, tails you lose" rules.

There are two sides to the fairness coin, of course, and the majority properly questions whether retroactive application of the Act is fair to Gannett. *Bradley,* 416 U.S. at 711, 94 S.Ct. at 2016. Two retroactive changes are at issue here. First, the Act allowed a jury to hear Mojica's Title VII claims. The majority protests that "[t]o allow a jury trial for a case governed substantively by the former Title VII is to ignore the equitable nature of that provision." (Maj.Op. at 559). So what? Cases following *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, teach that juries are procedural. *Simler v. Conner,* 372 U.S. 221, 83 S.Ct. 609, 9 L.Ed.2d 691; *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988. The majority admits that procedural changes in the law apply to cases pending when the new procedure is enacted—which means that Mojica should get a jury because her case went to trial after the Act became law.

The other retroactive change at issue is whether Gannett should face liability for compensatory and punitive damages (under § 1981 or Title VII) as an alternative to equitable relief (under Title VII alone) as a result of its discrimination against Mojica. Compensatory damages and back pay are similar awards here because they both describe the money that Gannett must pay Mojica to make whole her loss. It is perfectly fair to label Gannett's liability "compensatory damages" retroactively so long as the damages it may face are roughly comparable to its exposure under an equity regime. The majority's mantra that employers "are entitled to an opportunity to readjust their level of care" in response to the risk of greater liability (Maj.Op. at 559), quoting *Luddington,* 966 F.2d at 229, does not apply to compensatory damages, for it seems unlikely that such damages expose employers to greater risks than Title VII's equitable remedies. The Act's offer of compensatory damages and a jury option under Title VII is thus a procedural change that must apply to new trials—if not to cases pending on appeal—under the majority's own analysis.[6]

Punitive damages present a more difficult issue. These aim to punish Gannett rather than to compensate Mojica; applying them here exposes Gannett to the risk of a significantly larger damage award, even though Section 102(b) caps liability at $300,000. But it does not take a social scientist to figure that the discounted risks of large punitive damages awards under the Act's "new" damages regime are probably slight compared to the fixed costs of responding to anti-discrimination laws. Therefore, holding employers like Gannett liable for punitive damages would not significantly raise the costs they might reasonably expect to incur under civil rights statutes. Since the *Patterson* regime turned out to be a two-year sabbatical from an earlier damages regime, now restored by the Act, there is nothing fundamentally unfair about holding employers retroactively liable for pre-*Patterson* punitive damages. *Gersman v. Group Health Ass'n, Inc.,* 975 F.2d 886, 907–908 (D.C.Cir.1992) (Wald, J.,

---

5. The majority incorrectly implies that all of Gannett's discriminatory conduct occurred between 1989 and 1990 under the *Patterson* regime. Mojica, however, asserts that in 1986 Gannett denied her a promotion and told her to her face that she had not been given the job because she was an Hispanic woman.

6. Other sections of the Act are arguably procedural as well, and should apply to new trials. See, *e.g.,* Section 105 (burdens of proof in disparate impact cases); Section 108 (non-party challenges to consent decrees); Section 113 (court-awarded expert fees).

dissenting) (retroactive application of the Act would not disrupt employers' settled expectations). If the majority believes that punitive damages cannot fairly be applied retroactively, it should exempt employers from these awards rather than recasting Section 102 in its entirety as a substantive change in the law.

Only two provisions of the Act relevant to Mojica's case are arguably "substantive" enough that they should apply only to post-Act conduct: the punitive damages provision in Section 102, and Section 101's restoration of the traditional ban on discrimination in the performance of contracts under § 1981. The decision below could be upheld without applying either of these provisions retroactively. The Act states that compensatory damages are available under Title VII "provided that the complaining party cannot recover under [42 U.S.C. § 1981] * * *." Section 102(a), 105 Stat. at 1072. Even if we decided that Section 101 did not apply retroactively and that Mojica therefore cannot recover under § 1981, Section 102(a) would still allow her to seek legal remedies under Title VII, and Section 102(c) would allow her to make a jury demand. Since there is no reason to fear that a jury given a blanket instruction on national origin discrimination would reach a different verdict without § 1981 as a redundant basis for liability, I would affirm the jury's verdict (as modified by the district court to overturn the punitive damage award). *Lytle v. Household Mfg., Inc.,* 494 U.S. 545, 110 S.Ct. 1331, 108 L.Ed.2d 504; *Littlefield v. McGuffey,* 954 F.2d 1337, 1345 (7th Cir.1992).

As between the approaches outlined above—applying the Act to post-Act trials, or applying the Act retroactively to all pending cases—I would favor the latter alternative if this were an issue of first impression. "The joint presumptions that court decisions apply retroactively while legislation operates prospectively have combined here to produce a result that is neither rational nor just." *Mozee,* 963 F.2d at 940 (Cudahy, J., dissenting). Because *Mozee* and *Luddington* resolved the difficult and distinct question of whether the Act should apply to cases pending on appeal, I see no reason to challenge their validity here. In the present case, however, this Court should honor Congress' intent to apply the Act to procedures in post-Act trials.

CUDAHY, Circuit Judge, with whom ILANA DIAMOND ROVNER, Circuit Judge, joins, dissenting.

I am pleased to join Judge Cummings' eloquent and extraordinarily perceptive dissent. He has succeeded in introducing reality into what is so frequently a superficial and wooden approach to applying the Civil Rights Act of 1991. Even though *Mozee* and *Luddington* are now the law of this Circuit, I agree with Judge Cummings that, despite those cases, or perhaps because of them, the 1991 Act properly applies to Mojica's post-Act trial.

I, of course, emphatically dissented as a panel member from the court's refusal in *Mozee* to apply the 1991 Act to pre-Act and pre-*Patterson* conduct. The result in that case I regarded as incorrect and unjust. It seems to me that the manipulation of musty maxims and presumptions of retroactivity and prospectivity has managed to leverage the fleeting months when *Patterson* was on the books into a much longer and continuing denial of the full protection of the civil rights laws. The manifest intent of Congress, as well documented by Judge Cummings, was to obliterate as expeditiously as possible *Patterson* and a number of other Supreme Court decisions that narrowed and limited long-standing protections of the civil rights laws. As Judge Cummings points out, all parties have been on full notice of the substance of those protections for a long time; they certainly do not come as a complete surprise to Gannett or other defendants. The Act, insofar as I am concerned here, merely restored the law promptly to the course it had followed for years. It seems to me wholly unrealistic to believe that Congress wanted to endow *Patterson* and similar cases with some sort of life after death. Hence, I cannot countenance their continued application long after they have been legislatively erased from the books. I, therefore, respectfully dissent.

RIPPLE, Circuit Judge, with whom ILANA DIAMOND ROVNER, Circuit Judge, joins, dissenting.

The Supreme Court of the United States has granted certiorari in two cases that will address the retroactivity of the Civil Rights Act of 1991. It is highly likely that the Court will address the fundamental dichotomy presented by the conflicting holdings in *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 208, 109 S.Ct. 468, 471–72, 102 L.Ed.2d 493 (1988) and *Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). Once that basic issue is resolved, the more particular issues of retroactivity will be subject to relatively easy judicial resolution. Therefore, I believe it is a significant judicial diseconomy for this court to proceed to judgment in this en banc proceeding until that basic issue is resolved. I believe that the most appropriate course would have been to hold this case until after the Supreme Court renders its opinion.

If, despite the presently existing ambiguous precedent on retroactivity, we must deal with the merits at this time, I would hold that the Act is retroactive. Consequently, the prior panel holdings in *Luddington v. Indiana Bell Telephone Co.,* 966 F.2d 225 (7th Cir.1992), and *Mozee v. American Commercial Marine Service Co.,* 963 F.2d 929 (7th Cir.1992), ought to be overruled. In my view, even if we indulge in the general presumption that statutes are to be applied in a prospective fashion, that presumption is nullified in this case by the explicit language of the statute. Whatever the motivations of Congress in casting the statute in these terms, we must accept its manifest intent.